# [J-145A&B-2012]
## IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

## CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 650 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated 12/30/2011 |
| | : | (docketed on 1/3/2012) in the Court of |
| | : | Common Pleas, Criminal Division of |
| v. | : | Luzerne County at No. CP-40-MD- |
| | : | 0002778-1992 |
| | : | |
| MICHAEL BARDO, | : | |
| | : | |
| Appellant | : | SUBMITTED: November 5, 2012 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 651 CAP |
| | : | |
| Appellant | : | Appeal from the Order dated 12/30/2011 |
| | : | (docketed on 1/3/2012) in the Court of |
| | : | Common Pleas, Criminal Division of |
| v. | : | Luzerne County at No. CP-40-MD- |
| | : | 0002778-1992 |
| | : | |
| MICHAEL BARDO, | : | |
| | : | |
| Appellee | : | SUBMITTED: November 5, 2012 |

## OPINION AND OPINION IN SUPPORT OF REVERSAL ON DOCKET No. 651 CAP

**PER CURIAM**                                    **DECIDED:  December 16, 2014**

The Court is unanimous in the view that the appeal at Docket No. 650 CAP should be affirmed, but is evenly divided on the appeal at Docket No. 651 CAP; therefore, the grant of penalty phase relief, at issue in No. 651 CAP, is affirmed by operation of law.  This *per curiam* Opinion, in Part II, represents the Opinion of the Court as to the appeal at docket No. 650 CAP, which is Michael Bardo's

appeal from the order of the PCRA[1] court denying him guilt phase relief and also denying several of his penalty phase claims. In Part I, however, this Opinion expresses only the views of Mr. Chief Justice Castille and Messrs. Justice Eakin and Stevens as to docket No. 651 CAP, which is the Commonwealth's appeal from the grant of penalty phase relief.

## Background

In September 1992, Bardo was arrested for the death and indecent assault of his three-year-old niece. Evidence presented at trial in January 1993 included Bardo's statement to police that he had digitally penetrated the child's vagina, accidently killed her by putting his hand over her mouth to quiet her, placed her body in a trash bag, and threw it from a bridge into a creek. The defense strategy at trial was to acknowledge that Bardo was criminally responsible for the child's death, but to try to establish that the killing was not intentional. The Commonwealth's forensic pathology expert testified that the child's death was due to asphyxia resulting from a deliberate, forceful compression of her neck lasting four to five minutes, with the pressure continuing even after she lost consciousness. Commonwealth v. Bardo, 709 A.2d 871, 877 (Pa. 1998). The jury found Bardo guilty of first-degree murder and aggravated indecent assault. Following the penalty phase of trial, the jury found two aggravating circumstances: killing in the perpetration of a felony and killing of a person under the age of twelve.[2] One or more jurors also found the following mitigating factors: Bardo's mother's testimony, his school records and background, his acceptance of responsibility/remorse, his willingness to plead, and his alcohol abuse. See Sentencing Verdict Slip, dated 1/28/93, at 4; Notes

---

[1] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.

[2] Respectively, 42 Pa.C.S. §§ 9711(d)(6), (d)(16).

of Testimony ("N.T.") Trial, 1/28/93, at 844-55 (polling the jury).[3]  Finding unanimously that the aggravating factors outweighed the mitigating factors, the jury determined that Bardo should be sentenced to death.  The trial court accordingly imposed the death sentence, and, on February 27, 1998, this Court affirmed the judgment of sentence on direct appeal.  Bardo, 709 A.2d at 879.

Bardo filed a timely PCRA petition, and on December 6, 2007, the PCRA court appointed new counsel,[4] who filed an amended PCRA petition on June 18, 2008. Following a four-day hearing in November 2009, the PCRA court granted Bardo a new penalty phase hearing based on the court's finding of ineffective assistance of counsel with respect to the presentation of evidence of mitigating factors; the PCRA court denied all of Bardo's other claims.

In order to obtain collateral relief pursuant to the PCRA, a petitioner must establish by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). Commonwealth v. Spotz, 18 A.3d 244, 259 (Pa. 2011).  These circumstances include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, any one of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."  42 Pa.C.S. § 9543(a)(2)(i) and (ii).  In addition, a petitioner must show that the claims of error have not been previously litigated or waived.  42 Pa.C.S. § 9543(a)(3).  An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a

---

[3] The opinion of the PCRA court, in setting forth the background of the case, neglected to note that at least one juror found alcohol abuse as a mitigating factor.  See PCRA Court Opinion, filed 1/3/12, at 17.

[4] It is not clear from the record why the appointment of new counsel was delayed for many years.

matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b).

All of the issues before this Court involve allegations of ineffective assistance of counsel.[5] Counsel is presumed effective, and the petitioner bears the burden of proving otherwise. Commonwealth v. Roney, 79 A.3d 595, 604 (Pa. 2013). To prevail on an ineffectiveness claim, the petitioner must plead and prove, by a preponderance of the evidence, the Sixth Amendment performance and prejudice standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). This Court has divided the performance component of Strickland into two sub-parts dealing with arguable merit and reasonable strategy. Commonwealth v. Baumhammers, 92 A.3d 708, 719 (Pa. 2014). Thus, to prevail on an ineffectiveness claim, the petitioner must show: that the underlying legal claim has arguable merit; that counsel had no reasonable basis for his or her action or omission; and that the petitioner suffered prejudice as a result. Id. (citing Commonwealth v. Pierce, 527 A.2d 973, 975-76 (Pa. 1987)).

With regard to "reasonable basis," the PCRA court "does not question whether there were other more logical courses of action which counsel could have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis." Roney, supra (quoting Commonwealth v. Hanible, 30 A.3d 426, 439 (Pa. 2011)). [The PCRA court] will conclude that counsel's strategy lacked a reasonable

---

[5] The direct appeal in this case was decided in 1998, well before our decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), which held that claims of ineffectiveness of trial counsel should be deferred until collateral review. See, e.g., Commonwealth v. Hanible, 30 A.3d 426, 439 (Pa. 2011). The record reveals that Bardo was represented by the Luzerne County Public Defender's Office at trial and on direct appeal. Accordingly, his PCRA petition was the first opportunity for him to raise claims of counsel ineffectiveness.

basis only if the petitioner proves that a foregone alternative "offered a potential for success substantially greater than the course actually pursued." Id. (quoting Spotz, 18 A.3d at 260). To establish Strickland prejudice, the petitioner must show that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's action or inaction. Id. A "reasonable probability" is, for example, a probability sufficient to undermine confidence in the verdict returned by the jury. Commonwealth v. Gibson, 951 A.2d 1110, 1120 (Pa. 2008) ("Gibson I") (citing Strickland, 466 U.S. at 694). When assessing prejudice in the context of a claim of trial counsel ineffectiveness for failing to present additional evidence of mitigation in a death penalty case, the PCRA court must directly compare the mitigation case offered at trial with the credited mitigation evidence offered on post-conviction review. The goal of this comparison is to determine whether it is (or is not) reasonably probable that, had the additional evidence of mitigation been presented at trial, at least one juror would have concluded that the mitigating circumstances outweighed or were as weighty as the aggravating circumstances, and thus would have voted for a sentence of life imprisonment rather than death. Commonwealth v. Beasley, 967 A.2d 376, 391 (Pa. 2009); Gibson I, 951 A.2d at 1123.[6]

On appellate review, this Court must determine whether the PCRA court's rulings are supported by the record and are free of legal error. Spotz, 18 A.3d at 259. The

---

[6] Recently, in Commonwealth v. Tharp, 101 A.3d 736, 773 n.28 (Pa. 2014), this Court rejected a prior approach that Strickland prejudice could not be established merely by showing on post-conviction review that trial counsel had failed to present additional evidence supporting a mitigating factor that was found by the sentencing jury. See id. at 776 (Castille, C.J., concurring, joined by Eakin, J.) (noting that four concurring Justices favor overruling Commonwealth v. Marshall, 812 A.2d 539 (Pa. 2002), and Commonwealth v. Rios, 920 A.2d 790 (Pa. 2007), to extent that those cases required proof of an additional mitigating factor to establish prejudice; see also id. at 777-78 (Saylor, J., concurring, joined by Todd, J., and Eakin, J., concurring).

ineffectiveness inquiry constitutes a mixed question of law and fact. Commonwealth v. Martin, 5 A.3d 177, 197 (Pa. 2010) (citing Strickland v. Washington, 466 U.S. 668, 698 (1984)); see id. at 205 (Castille, C.J., concurring). If supported by the record, the PCRA court's credibility determinations and factual findings are binding on this Court; however, we apply a de novo standard of review to the PCRA court's legal conclusions. Spotz, 18 A.3d at 259; Martin, 5 A.3d at 197.

When making the ultimate prejudice assessment in a claim of counsel ineffectiveness for failing to present additional evidence of mitigation, which is the subject of the Commonwealth's appeal addressed in Part I below, this Court must reweigh the evidence in aggravation against the totality of the evidence of mitigation, which includes both the evidence presented at the penalty phase hearing and the credited evidence on PCRA review. Commonwealth v. Gibson, 19 A.3d 512, 526 (Pa. 2011) ("Gibson II"). This Court has acknowledged that such reweighing is not "an exact science," but has also concluded that we may evaluate the relative strength of the aggravating and mitigating circumstances to determine if the new evidence in mitigation would have been reasonably likely to sway a juror to alter his or her conclusion and vote for a sentence of life imprisonment rather than death. Id. at 530-31. When the aggravating circumstances are substantial, it may be particularly difficult to establish prejudice based on additional mitigation evidence proffered upon PCRA review. Id. at 531 (citing Smith v. Spisak, 558 U.S. 139 (2010)).

## I. The Commonwealth's Appeal (651 CAP)

We address first the Commonwealth's appeal, where the sole claim is framed as follows:

> Whether the PCRA Court erred by granting [Bardo] a new sentencing hearing where the court erroneously determined

that the alleged additional mitigating evidence had arguable merit, that counsel would have known about the evidence at the time of trial, that counsel did not have a reasonable strategic basis for not presenting the evidence, and that defendant was prejudiced by the omission?

Commonwealth's Brief at 4. The PCRA court's basis for granting Bardo a new penalty phase hearing was its finding that trial counsel was ineffective in failing to present additional evidence of mitigation, particularly expert testimony concerning his mental health history, diagnoses and treatment, and his childhood environment and upbringing. PCRA Court Opinion, filed 1/3/12, at 26-46. Following the directives set forth by this Court in Gibson II, 19 A.3d at 526-27 and Gibson I, 951 A.2d at 1122-23, the PCRA court compared in detail the mitigation evidence presented at trial with the evidence offered at the PCRA hearing, as follows.

During the penalty phase of trial, defense counsel presented seven witnesses: Bardo himself; his mother, Judith Wolfe; a Wilkes-Barre city health inspector; an assistant principal at Bardo's junior high school, the last school he attended; two of Bardo's school teachers; and a neighbor of Bardo's family. Ms. Wolfe testified that Bardo was the sixth of her seven children, and she could not remember the year he was born. Bardo's father (George Bardo) was an alcoholic who "never came home" and drank to the point of drunkenness "all the time"; had no contact with his son since the time Bardo was a toddler; and tried to commit suicide by cutting his wrists with a razor blade at the family home, an injury that he survived. Ms. Wolfe did not think that Bardo remembered his father, and his stepfather did not participate in Bardo's activities or act as a father figure to him. Bardo went to several schools and the family moved often. Ms. Wolfe acknowledged that she had her "hands full" with her children, and had a hard time controlling her son when he got older. Bardo began drinking at about age thirteen, and at times "fell in the door" to the family home due to his intoxication. Also, as a

young teenager, Bardo was sexually abused on a number of occasions by a man who bought beer for him. Ms. Wolfe learned about this sexual abuse from Bardo when he was eighteen years old, although it had occurred years earlier. Ms. Wolfe thought that Bardo married at age sixteen. He had two children, ages six and five, by the time of trial. At one time, according to Ms. Wolfe, Bardo and his wife lived in an empty warehouse. Finally, Ms. Wolfe asked the jury to spare her son's life. N.T. Penalty Phase, 1/28/93, at 756-73.

As testified to by an assistant principal and his teachers, Bardo did not have behavior problems in school, but his academic performance was extremely poor; he failed fifth grade, he failed seventh grade twice, and he dropped out entirely in the ninth grade at age seventeen. His appearance in school was very unkempt. A teacher testified that Bardo "had a very difficult time" in school, and "was in over his head." Bardo went to the Children's Service Center at age fifteen for help functioning in a school setting. The assistant principal testified that Bardo's "parents were cooperative, but things did not change that much." However, a teacher testified that Bardo's parents were uncooperative on the rare occasion when school personnel were successful in contacting them. As another teacher testified, Bardo was already married in the ninth grade, at which point he was "relatively neat and clean" and living with his wife's family. Id. at 715-49.

A neighbor testified that, in the year before Bardo's offenses, loud noise emanated from the Bardo family residence, and family members fought in the streets and exhibited signs of drunkenness. A city health inspector testified that, around the time of the offenses, the Bardo residence contained numerous animals and was infested with fleas; the house required the services of an exterminator, but was habitable. Id. at 703-06, 754-55.

Bardo testified that he was an alcoholic and that he had started drinking alcohol at approximately eleven or twelve years of age, resulting in blackouts after binge drinking, and interference with his schooling. He had moved many times with his mother as a child, did not like school, and did not have a close family. He did not know his father, and his stepfather was not involved in his life. He was repeatedly sexually abused by a man who bought beer for him; he remembered waking up naked in the man's house after a night of drinking. He went to the Children's Service Center, where he enrolled in the Adolescent Learning Center program; although he claimed to do well there, he quit one day after a quarrel with his girlfriend (later wife), and he did not return. He lived in an abandoned, rundown warehouse with his wife for a while. He testified that he had low self-esteem and felt inferior, often feeling like he was nothing compared to other people. He further testified to two suicide attempts in 1985. In the first attempt, he and his wife took overdoses of prescription pain pills, and in the second, he cut his wrists. He was hospitalized after both incidents. He knew that his father had also cut his wrists. Finally, Bardo accepted responsibility for the victim's death, was remorseful, and asked for mercy. Id. at 775-93; see PCRA Court Opinion at 26-28. No mental health professional testified during Bardo's trial.

In contrast, at the PCRA hearing, three mental health experts testified for the defense as to Bardo's impoverished childhood and miserable home life, and as to his psychiatric history and diagnoses at the time of the offenses. These defense experts were: (1) Neil Blumberg, M.D., a forensic psychiatrist who evaluated Bardo in the spring of 2008 and who opined that, at the time of the 1992 offenses, Bardo was suffering from six mental disorders, some of which involved alcohol abuse; (2) Matthew Berger, M.D., a forensic psychiatrist, who had been retained by trial counsel in 1993 and had twice evaluated Bardo, the first time at the request of trial counsel prior to trial, and the

second time at the request of PCRA counsel in 2009, after which he diagnosed Bardo as suffering from several mental disorders, in partial agreement with Dr. Blumberg's diagnoses; and (3) Ned Delaney, a licensed psychologist, who had also been retained by defense counsel at the time of trial to evaluate Bardo for his history of alcohol abuse and his degree of intoxication at the time of the offenses. In addition, PCRA counsel retained Gary Lage, Ph.D., a pharmacologist and toxicologist, to estimate Bardo's blood alcohol content, and the likely psychological and physiological effects of his intoxication, at the time of the offenses. Finally, PCRA counsel proffered the testimony of Bardo's trial counsel, who confirmed that they had retained Dr. Berger and Mr. Delaney prior to trial, but did not call either to testify. The sole Commonwealth witness at the PCRA hearing was John O'Brien, M.D., a forensic psychiatrist who had evaluated Bardo in 2009.

After hearing testimony from the above witnesses; reviewing Bardo's records, including school, juvenile, agency, and hospital records; and comparing the evidence of mitigation presented at the penalty phase and at the PCRA hearing, the PCRA court concluded: "Trial Counsels' penalty phase presentation was disjointed, scattered and particularly ineffectual in its failure to synthesize readily available life history evidence of mental illness, family dysfunction and physical and sexual abuse into a coherent and persuasive case in support of mitigation." PCRA Court Opinion at 37. The PCRA court singled out the "inexplicabl[e]" failure to call Dr. Berger and Mr. Delaney as penalty phase expert witnesses, even though they had informed trial counsel of their possible ability to provide evidence in support of mitigation. Id. In its Pierce/Strickland analysis, the PCRA court concluded as follows with regard to the arguable merit of Bardo's ineffectiveness claim:

> At the very least, the evidence presented during the
> PCRA hearing established there was mental health evidence

found in records contained in Trial Counsels' file and/or in readily available records at the time of trial. . . . This evidence and associated [multiple mental health] diagnoses would have supported the substantially impaired statutory mitigating fact[or] found at 42 Pa.C.S. § 9711(e)(3), and the extreme disturbance statutory mitigating factor under 42 Pa.C.S. § 9711(e)(2). This evidence and/or diagnoses was [sic] not presented at the penalty phase even though Dr. Berger advised Trial Counsel he could assist in the penalty phase, and Mr. Delaney offered a report outlining several diagnoses and/or factual underpinning of the same supporting a mitigating factor.

Id. at 40.

The PCRA court further relied on the PCRA hearing testimony of trial counsel to conclude that there was no reasonable basis for the failure to investigate fully the potential mitigating evidence that Mr. Delaney and/or Dr. Berger could have provided and then to proffer the testimony of these expert witnesses as to Bardo's mental health. In addition, the PCRA court specifically noted that lead counsel "inexplicably" delegated responsibility for the preparation and presentation of the penalty phase to second chair counsel, despite that attorney's lack of experience and training in capital litigation. Id. at 41-43.

Finally, the PCRA court concluded that Bardo had suffered prejudice. The PCRA court found that the evidence presented at the PCRA hearing was not merely "additional evidence" as to mitigating factors actually found by the jury, but "appear[ed] as an entirely new presentation," including, for the first time, expert testimony and volumes of corroborating records. Id. at 44. Such evidence, in the PCRA court's view, was sufficient to warrant presentation to the jury of both the Section (e)(2) and the Section (e)(3) mitigating circumstances, which require the petitioner to establish, respectively, that he was under the influence of an extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the

requirements of law was substantially impaired. In addition, the PCRA court concluded that the evidence "could and should have been presented for consideration under the catchall (e)(8) mitigator." Id. at 45. In its conclusion, the PCRA court stated: "We . . . hold that there is a reasonable probability that had the PCRA evidence been introduced at the penalty phase of Bardo's capital murder trial, one or more jurors were reasonably likely to have found additional mitigating circumstances and that those mitigating circumstances outweighed the aggravating circumstances." Id. at 44-46. For the following reasons, we would reverse the PCRA court's holding in the Commonwealth's appeal.

We address first the evidence of Bardo's alcohol abuse, intoxication at the time of the offenses, and alcohol dependence which were included in the list of Bardo's mental health diagnoses by one or more of his PCRA expert witnesses.[7] All of the PCRA expert witnesses, including the Commonwealth's expert, Dr. O'Brien, agreed that Bardo had a history of alcohol abuse. There was uncontested evidence from two experts, based on estimates of Bardo's alcohol consumption in the hours before the offenses, that his blood alcohol content at the time of the offenses was .09% or .10%. N.T. PCRA Hearing, 11/10/09, at 286, & 11/9/09, at 209 (estimates of Mr. Delaney and Dr. Lage, respectively). Bardo's PCRA expert witnesses all opined that he had been drinking and was intoxicated to some degree at the time of the offenses. N.T. PCRA Hearing, 11/9/09, at 18-19, 40, 94, 109; 11/10/09, at 286-87; & 11/13/09, at 538-39.

---

[7] The PCRA court did not draw conclusions specifically with regard to the value in mitigation of these alcohol-related factors. Thus, the weight that the PCRA court applied to expert testimony addressing Bardo's alleged alcohol abuse, intoxication, and dependence is unclear. For the reasons discussed in the text, infra, we would conclude that, to the extent the PCRA court relied on the mitigation value of these alcohol-related factors to award a new penalty phase hearing, the court erred.

With regard to alcohol dependence, the expert opinions were more varied. Mr. Delaney and Dr. O'Brien opined that Bardo was not alcohol dependent. Id., 11/10/09, at 294-96; & 11/13/09, at 642. Dr. Blumberg and Dr. Berger opined that he was alcohol dependent, but the latter expressed many qualifications to this diagnosis, including related to the time period of the dependency and the lack of any documentation that Bardo had ever experienced withdrawal symptoms. Id., 11/9/09, at 18-19, 41-44, 147; & 11/13/09, at 534-37, 569-74. This expert testimony was based on Bardo's self-reports during his mental health evaluations, a corroborating history of public intoxication requiring police intervention, and hospital reports from two incidents in which Bardo had seriously injured himself while intoxicated in 1984 and 1985, when he was, fifteen and sixteen years of age.[8]

With regard to Bardo's intoxication on the night of the offenses, his argument places considerable emphasis on the estimates of two experts that his blood alcohol level bordered on the then-legal limit under the Motor Vehicle Code. However, in our view, those estimates should be of little moment in the present inquiry. The standard for proof of voluntary intoxication is the same in the guilt and penalty phases. Commonwealth v. Marinelli, 810 A.2d 1257, 1277 (Pa. 2002) (citing Commonwealth v. Carpenter, 617 A.2d 1263, 1268 (Pa. 1992)). Specifically, to establish the Section 9711(e)(3) mitigating factor, "the evidence would have to show that the [accused] was overwhelmed or overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill." Commonwealth v. Flor, 998 A.2d 606, 627 n.7 (Pa. 2010) (quoting Marinelli, supra at 1277). There is no evidence in the record to

---

[8] Dr. Blumberg testified that his diagnosis of alcohol intoxication on the night of the offenses was "based a lot" on Bardo's self-reported drinking prior to the offenses, as well as the police report and the affidavit of Dr. Lage. N.T. PCRA Hearing, 11/9/09, at 40.

suggest that Bardo met this standard for intoxication; in fact, the evidence at trial was overwhelmingly to the contrary. In this respect, we agree with the Commonwealth's presentation in its brief to this Court at pages 22 through 41.

In his interviews with police detectives on September 3 and 4, 1992, Bardo recalled in detail the events just prior to, during, and after the child's murder. Bardo remembered going to the Sans Souci Lounge with his assistant manager, Robert Kisankowski, on September 2, 1992, at approximately midnight, after finishing his shift at the local Burger King and going home to change his clothing. He remembered sharing three pitchers of Coors Light beer with Mr. Kisankowski and conversing with two other patrons. He remembered the name of the band that was playing. He remembered leaving the bar at approximately 1:50 a.m. in Mr. Kisankowski's car, and returning to the home that he shared with his mother and stepfather. He remembered that his mother and his niece were sleeping together on an L-shaped sofa in the living room when he returned home, and he remembered what they were wearing. He remembered eating some soup and bread when he came home. He remembered rubbing his niece's legs and buttocks, stopping for a little while when she began to move around, going to the kitchen, returning to the living room, and then starting to rub the child again and placing his finger in her vagina. When she started to whine, he "freaked out" and covered her mouth with his hand. He went again to the kitchen, and when he returned to the living room, he realized the child was not breathing. He again "freaked out," but had the wherewithal to attempt to hide her body, first placing the child in a trash bag from the kitchen cabinet, and then leaving his home by the back door and throwing her body in a nearby creek. He remembered returning home after disposing of her body, washing his work uniform, and then going to bed for the night. See N.T. Guilt Phase, 1/25/93, at 189-98 (testimony of Detective Michael Dessoye); & 1/26/93, at 252,

259-62, 270-72 (testimony of State Police Corporal Michael White, which included reading Bardo's statement to police). In our view, these deliberate, directed, controlled, self-aware actions, all recalled by Bardo and all supported by the evidence at trial, significantly undermined any claim of overwhelming, overpowering intoxication to the point of losing one's faculties.

Furthermore, we see nothing in the record testimony of Bardo's own experts to support the necessary standard of intoxication to establish the Section 9711(e)(3) mitigator. See N.T. PCRA Hearing, 11/13/09, at 538 (testimony of Dr. Berger: "I would have been able to say [that] there would be some impact on his functionality based on his alcohol use."); & 11/10/09, at 283 (testimony of Mr. Delaney that based on his estimate that Bardo's blood alcohol level at the time of the offenses was .09%, Bardo's impulse control would have been "greatly diminished" and his "need for immediate gratification would have been higher"); & 11/9/09, at 212-13 (testimony of Dr. Lage that a typical individual with a blood alcohol level of .10% would exhibit impaired judgment, a loss to some extent of inhibitions, diminished coordination); id. at 94 (testimony of Dr. Blumberg that Bardo "has a lengthy history of drinking excessively and also engaging in very impulsive, poorly thought-out behaviors when under the influence of alcohol, in particular, becom[ing] disinhibited sexually when under the influence of alcohol"); id. at 109 (testimony of Dr. Blumberg that, when he interviewed Bardo fifteen years after the offenses, Bardo told him that he had "felt a buzz, felt under the influence of alcohol" when he reached home on the night of the offenses). None of these expert opinions supported a finding that Bardo was overwhelmed or overpowered by alcohol to the point of losing his faculties, and thus none can be relied on to support a finding of Section 9711(e)(3) mitigation. Accord Gibson II, 19 A.3d at 529.

Bardo appears to argue that his voluntary intoxication should also have been considered as a Section 9711(e)(2) mitigating factor, i.e., extreme mental or emotional disturbance. Based on our analysis above, we conclude that no proffered evidence supported this statutory mitigator, as the Commonwealth explains in its brief at pages 41 and 42. The testimony of Bardo's experts that there was "some impact on his functionality" due to alcohol use, that his impulse control was "greatly diminished" and he became "disinhibited sexually" when intoxicated, and that he self-reported feeling a "buzz" on the night of the offenses, does not, in our view, constitute sufficient evidence that he was subject to extreme mental or emotional disturbance. See Commonwealth v. Saranchak, 866 A.2d 292, 305-06 (Pa. 2005) (defendant's history of mental health difficulties and alcoholism, and likelihood of having been intoxicated at time of offenses are concerns distinct from extreme mental or emotional disturbance, pursuant to Section 9711(e)(2)).

In sum, we find no evidence presented at the penalty phase or at the PCRA hearing to support a claim that Bardo's voluntary intoxication on the night of the offenses was a mitigating circumstance under either the Section 9711(e)(2) or (e)(3) statutory mitigators.

A jury may, of course, consider alcohol consumption and abuse as a possible mitigating factor under the catch-all mitigator, Section 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). See Gibson II, 19 A.3d at 529 (citing Flor, 998 A.2d at 627 n.7); Commonwealth v. Laird, 988 A.2d 618, 624 n.1 (Pa. 2010). However, it is important to note that nothing in our decisional law suggests that alcohol abuse or consumption on the day of the offense is, in and of itself, a mitigating circumstance under subsection 9711(e)(8) or any other statutory provision. Indeed, as this Court has

previously noted, jurors are aware of a volitional component to the use of alcohol and of alcohol's disinhibiting effect, and thus, it is far from clear that alcohol use or abuse has consistent or substantial mitigating value. The U.S. Supreme Court has suggested the same. See Gibson II, 19 A.3d at 527 (citing Montana v. Egelhoff, 518 U.S. 37, 44 (1996) (plurality) for proposition that "historically, voluntary intoxication has been viewed by society as aggravating the severity of a given offense").

Based on the testimony of Bardo and his mother, some members of the jury did find that Bardo's alcohol abuse was a mitigating factor under Section 9711(e)(8). The additional evidence proffered at the PCRA hearing was expert testimony addressing Bardo's alcohol abuse and intoxication at the time of the murder. However, trial counsel's testimony at the PCRA hearing is also relevant here. Specifically, trial counsel testified that Bardo had told him that he was not drunk on the night of the offenses and that he knew what he was doing. N.T. PCRA Hearing, 11/12/09, at 394. Trial counsel further testified that he did not consider as mitigating the facts that Bardo "drank beer, killed [ ] and molested his niece." Id. at 373 ("[T]he fact that [Bardo] went to the Sans Souci Lounge and [ ] drank beer, [ ] and came home and killed her, wasn't something that I was really [ ] too heavy on pursuing."). We cannot say that trial counsel's view that Bardo's voluntary intoxication on the night of the offenses lacked mitigation value was constitutionally unreasonable.[9,10]

---

[9] Accord Commonwealth v. Crawley, 663 A.2d 676, 680 n.8 (Pa. 1995) (concluding that counsel could reasonably conclude that evidence of appellant's illicit drug use would have served only to further inflame jurors against appellant).

[10] Mr. Delaney made an error in his estimate of Bardo's blood alcohol level in the 1993 report he provided to trial counsel. Based on an erroneous estimate of the volume of beer that Bardo drank in the hours before the offenses, Mr. Delaney had estimated that Bardo's blood alcohol level was .03%. When the error was realized, apparently at some point in the PCRA process, Mr. Delaney upwardly revised his estimate of Bardo's blood alcohol level to .09%. See N.T. PCRA Hearing, 11/10/09, at 278-88. Mr. Delaney's
(...continued)

With regard to alcohol dependence and any resulting mitigation value, the PCRA testimony, including that of Bardo's three expert witnesses who addressed his alcohol dependence, was inconsistent. Dr. Blumberg was the strongest proponent of the view that Bardo was alcohol dependent, basing his diagnosis primarily on Bardo's various self-reports of blackouts; tolerance; getting "the shakes"; drinking to get drunk; and "an awareness that [ ] he gets into trouble when he drinks [but] an inability or awareness to stop drinking." N.T. PCRA Hearing, 11/9/09, at 147; see also id. at 149 (Dr. Blumberg testified that Bardo's "report and the history that he describes is absolutely supportive of alcohol dependence, at the very least alcohol abuse"); see also id. at 150 (Dr. Blumberg testified that Bardo described "a clear cut history [of] a severe alcohol problem with tolerance," and clarified that a "diagnosis of alcohol dependence is based on the history"). However, Dr. Blumberg recognized that Bardo's self-report of tremors was the only evidence that he had ever experienced any symptoms of withdrawal, one of the indicators of alcohol dependence. Id. at 41, 128, 131-33.

Although Dr. Berger also diagnosed Bardo as alcohol dependent, he suggested a number of qualifications, most importantly related to the timing of the dependence. In the context of a line of questioning during cross-examination about Bardo's childhood and teenage years, when asked whether Bardo was alcohol dependent, Dr. Berger responded: "It's hard to say. I mean, I think there probably was [alcohol] dependence during those years. … [T]here is ample documentation from the numerous times he was locked up in the drunk tank and what he described as too numerous to count arrests for alcoholism and sort of a pattern of clear alcohol abuse, can I say 100 per cent it was dependence? No, I can't. Clearly, it heads in that direction if it's not." N.T. PCRA

(continued…)
error is not chargeable to trial counsel, of course; and, in any event, for the reasons discussed in the text, we would conclude that Bardo was not prejudiced.

Hearing, 11/13/09, at 569 (emphasis added). Furthermore, Dr. Berger testified that he could not document that Bardo had "withdrawal symptomology" at the time of the offenses, id. at 574, raising a question as to the relevance of his diagnosis of alcohol dependence.

Meanwhile, Mr. Delaney had concluded in 1993 that Bardo was not alcohol dependent. N.T. PCRA Hearing, 11/10/09, at 294-96; see Psychological Evaluation of Michael Bardo by Ned Delaney, dated 1/27/93 ("1993 Psychological Evaluation"). Like Mr. Delaney, Dr. O'Brien concluded that Bardo was not alcohol dependent, based on the lack of any indication that Bardo had ever experienced withdrawal symptoms during any of his several hospitalizations or incarcerations, as well as the lack of evidence of escalating use of alcohol or tolerance, especially during the two years prior to the current offenses when Bardo was working, functioning, undergoing counseling, and drinking on a social basis without experiencing a great deal of difficulty. N.T. PCRA Hearing, 11/13/09, at 614-15, 625, 642, 648-49; see also id. at 649 (Dr. O'Brien testified that the diagnostic criteria for alcohol dependence require "physiological dependence on alcohol[, which is] indicated by evidence of tolerance or symptoms of withdrawal, and [ ] tolerance would be an increase and escalating amount of alcohol over time," and concluding that there was no evidence for these diagnostic criteria in Bardo's records). Consistent with Dr. O'Brien's and Mr. Delaney's views, it was undisputed that, even though Bardo had been admitted to the hospital once in 1984, three times in 1985, and once in 1988, and had been incarcerated several times, there was no documentation in any of the hospital or prison records that Bardo had ever suffered symptoms of or had been treated for alcohol withdrawal. N.T. PCRA Hearing, 11/9/09, at 118-19, 128, 131-33, 149; & 11/13/09, at 571-72, 574, 648.

On this record, we would conclude that there is no reasonable probability that any juror would have found that Bardo's alleged alcohol dependence was an additional mitigating factor under Section 9711(e)(8), the catch-all mitigating circumstance, and then reached a different sentencing verdict.[11] Our view is informed by the inconsistency of the testimony regarding alcohol dependence, even among Bardo's own expert witnesses; the reliance of all the experts exclusively on Bardo's self-reports for their conclusions regarding his alleged alcohol dependence; the equivocation of Dr. Berger on this issue; the fact that the strongest proponent of Bardo's alleged alcohol dependence, Dr. Blumberg, only interviewed Bardo in 2008, after he had been imprisoned for approximately fifteen years for his offenses; open questions as to the time period of any dependence; and the lack of any documentation that Bardo had ever suffered withdrawal symptoms during any of his hospitalizations or incarcerations. Moreover, similar to voluntary intoxication, alcohol dependence is not in and of itself a mitigating circumstance; more is required beyond the mere averment of dependence. Here, Bardo has done little more than to assert that he was alcohol dependent. In sum, we would conclude that Bardo has not carried his burden to show that trial counsel was ineffective for failing to present expert testimony regarding his abuse of alcohol, voluntary intoxication, and/or alcohol dependence. In reaching this conclusion, we do not discount the possibilities that some additional jurors might have found alcohol abuse as a mitigating factor, or that the juror(s) who found alcohol abuse as a mitigating factor might have applied more weight to this factor. However, for the reasons discussed above, we would find that the totality of any mitigating circumstances based on alcohol-related factors is minimal when compared to the egregious aggravating circumstances

---

[11] Section 9711(e)(8) is the only mitigator to which the allegations of Bardo's alcohol dependence could conceivably be relevant.

in this case, which involved the strangulation murder of a young child during an indecent assault. Accordingly, we would conclude that Bardo was not prejudiced by trial counsel's failure to present expert testimony regarding alcohol-related factors.

We turn now to the evidence of Bardo's other psychiatric diagnoses, and the effect that his difficult childhood had on his mental health, as presented by the experts who evaluated him shortly before the PCRA hearing, which took place fifteen years after the offenses. In Dr. Blumberg's opinion, at the time of the offenses, in addition to alcohol intoxication and alcohol dependence, Bardo suffered from four other mental disorders: chronic post-traumatic stress disorder ("PTSD"); dysthymic disorder; personality disorder not otherwise specified ("NOS") with schizoid, depressive, and inadequate features; and pedophilia. N.T. PCRA Hearing, 11/9/09, at 18-19. Dr. Blumberg also testified to Bardo's social and psychiatric history, as obtained from the interview with Bardo and from records readily available to trial counsel, including the extreme neglect, abuse, and chaos experienced by Bardo as a young child; his genetic pre-disposition to alcoholism, based on his father's alcoholism; his regular, heavy drinking beginning in his pre-teen years that had led to blackouts and risk of injury to himself or others; his sexual victimization at the hands of an older man during childhood; and his two suicide attempts and three psychiatric interventions. N.T. PCRA Hearing, 11/9/09, at 19-99; see PCRA Court Opinion at 28-32. Based on the combination and confluence of these diagnoses and factors, Dr. Blumberg further opined that two statutory mitigating circumstances were applicable: at the time of the offenses, Bardo was substantially impaired in his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, 42 Pa.C.S. § 9711(e)(3), and Bardo was under the influence of extreme mental or emotional

disturbance, id. § 9711(e)(2). N.T. PCRA Hearing, 11/9/09, at 19; Dr. Blumberg's Affidavit/Declaration at 12-13, ¶¶ 40-41.

Dr. Berger, Bardo's other psychiatrist-expert, opined that, at the time of the offenses, along with chronic alcohol/substance abuse and alcoholism, Bardo suffered from "major depression recurrent, very possibly dysthymic, and . . . symptoms of PTSD." N.T. PCRA Hearing, 11/13/09, at 528. Dr. Berger testified that Bardo "was self-reared[, having] had no rearing as a young child or a medium child." Id. at 530. Dr. Berger also testified that Bardo had started drinking alcohol at an early age and had experienced a home environment "at best neglectful," with inadequate food and dirty clothing. Id. at 533-34; see id. at 541 (testifying that the records show that Bardo "was brought up in a very dysfunctional family with little or no parenting skills," by a mother who had had six children by the age of twenty-six, with essentially no father figure in the household). Expanding on the chronic neglect Bardo had experienced as a child, Dr. Berger noted that he was one of the poorest in a group of poor children, was teased, was small for his age, and wore ill-fitting clothing. Id. at 542. Dr. Berger also noted that Bardo's family had moved frequently during his adolescence, and opined that these moves were significant because "it's often disruptive to children to have to move multiple times, because there is no sense of a secure environment," a potential detriment with even more impact due to Bardo's dysfunctional family. Id. at 546. Based on his review of the records of Bardo's mental health history and on information from Bardo directly, Dr. Berger opined that the Section 9711(e)(2) mitigating circumstance was applicable, i.e., at the time of the offenses, Bardo was under the influence of extreme mental or emotional disturbance. N.T. PCRA Hearing, 11/13/09, at 549.[12]

---

[12] Mr. Delaney, the psychologist retained by Bardo before trial, did not mention any mental health diagnoses other than alcohol abuse and did not opine that any statutory mitigators were applicable in his PCRA testimony, in his affidavit prepared at the (…continued)

Dr. O'Brien, the Commonwealth's psychiatric expert, testified that Bardo suffered from mixed personality disorder with antisocial, dependent, and avoidant features, as well as long-term alcohol abuse. N.T. PCRA Hearing, 11/13/09, at 642, 662, 705. Dr. O'Brien explained that the avoidant feature referred to feelings of inadequacy, social ineptness, and immaturity. Id. at 710-11. Although his mental health diagnoses were distinct from and more limited than those of Dr. Blumberg or Dr. Berger, Dr. O'Brien agreed that Bardo was raised in a dysfunctional family, citing his "unkept" home, his dirty clothing, inadequate food, lack of parental supervision and intervention, drinking at an early age, frequent moves with related changes of school, financial difficulties, neglect, and discipline involving physical abuse with a belt or paddle. Id. at 671-79, 693-95. However, Dr. O'Brien concluded, based on the records and his evaluation of Bardo, that neither statutory mitigator, Section 9711(e)(2) or (e)(3), was applicable. N.T. PCRA Hearing, 11/13/09, at 714, 719.

The PCRA court focused primarily on the testimony of Dr. Blumberg and Dr. O'Brien, concluding that "both are credible, but on the basis of what we saw and what we heard, we are persuaded by and more comfortable with the testimony presented by PCRA counsel." PCRA Court Opinion at 34. The PCRA court concluded that Bardo had established that trial counsel were ineffective for failing to proffer as mitigation evidence expert testimony regarding his history of mental health issues, his psychiatric

---

(continued…)
request of PCRA counsel, or in his 1993 report to trial counsel. See N.T. PCRA Hearing, 11/10/09, at 256-319; Affidavit/Declaration of Ned Delaney Pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904, undated, but prepared for PCRA purposes ("Affidavit/Declaration of Mr. Delaney") (Petitioner's Exhibit 32); Psychological Evaluation of Michael Bardo by Ned Delaney, dated 1/27/93 ("1993 Psychological Evaluation") (Petitioner's Exhibit 30).

diagnoses, and his childhood of neglect and abuse, which contributed to his psychiatric problems.

The Commonwealth argues that such evidence would have been cumulative of what the jury actually heard at trial and sentencing. Commonwealth's Brief at 66-67. We would find that the evidence presented at the PCRA hearing would not have led to a different penalty verdict. In our view, the record does not fully support the PCRA court's findings, and the court considered only the evidence in mitigation presented at the PCRA hearing, without weighing that evidence against the aggravating circumstances. Our re-weighing of the totality of the mitigating factors, including the additional evidence in mitigation presented at the PCRA hearing, as against the egregious aggravating factors in this case, leads us to conclude that Bardo was not prejudiced by trial counsel's failure to present expert testimony in the penalty phase as to Bardo's psychiatric history and diagnoses and his childhood environment.

The PCRA court particularly criticized trial counsel's failure to obtain and utilize all of Bardo's records, from school, Luzerne County Children and Youth Services ("LCCYS"), juvenile probation authorities, and from his various hospitalizations. We consider first the school records. The PCRA court expressly found that "Trial Counsel failed to obtain . . . school records for Bardo." PCRA Court Opinion at 36. However, this conclusion is not supported by the certified record. As noted, through the testimony of an assistant principal, penalty phase counsel presented numerous school records, detailing Bardo's poor academic performance from an early age until he left school at age seventeen. See N.T. Penalty Phase, 1/28/93 at 710-28. In addition, two of Bardo's teachers testified to his poor performance in school, his unkempt appearance, and his uninvolved parents. Id. at 729-35, 747-49. Bardo has not specified, and the PCRA court has not clarified, what additional school records trial counsel should have obtained

and utilized, and what additional insights these unspecified records might have offered. There is nothing in the record to suggest that the unspecified school records to which the PCRA court referred would have provided anything more than cumulative information to the testimony of the assistant principal and teachers.

In the context of school records, the PCRA court's opinion specifically mentions only the records of the Children's Service Center concerning Bardo's efforts in the program's Adolescent Learning Center when he was fifteen or sixteen years of age. See PCRA Court Opinion at 36; N.T. Penalty Phase at 727-28, 787-88 (respectively, assistant principal's testimony and Bardo's testimony). The PCRA court noted "[a]propos of Counsels' stewardship," that trial counsel had neglected to call as a witness a representative from the Children's Service Center for the purpose of admitting these records. PCRA Court Opinion at 36. During the PCRA proceedings, it was stipulated that trial counsel's files included Children's Service Center records for Bardo. See Stipulation between Petitioner and the Commonwealth regarding PCRA Hearing Testimony of Jessica Johnson, at ¶ 2. However, the content of the Children's Service Center records was never mentioned, never presented, and never discussed during the PCRA proceedings. PCRA counsel did not suggest, and the PCRA court did not determine, what information or insights would have been gained by admission of these records.

Thus, based on the certified record before us, we would conclude that Bardo has not established ineffective assistance based on trial counsel's failure to proffer his Children's Service Center records or any other school records.

With respect to Bardo's home environment during his childhood and early teenage years, as we have already summarized, Bardo's mother and Bardo himself testified at the penalty phase concerning his difficult and unsupervised childhood,

exemplified by his alcohol abuse beginning as a pre-teenager, the sexual abuse he experienced as a way of obtaining alcohol, and his two suicide attempts. The dysfunctional, chaotic, neglectful, unsupportive, and abusive nature of Bardo's childhood was further developed and presented at the PCRA hearing by expert witnesses, who based their testimony largely on Bardo's juvenile probation file and his LCCYS file, as well as on what Bardo himself related to them. PCRA Court Opinion at 29. More specifically, the PCRA court determined that the following was not presented to the sentencing jury: Bardo's genetic pre-disposition to alcoholism based on the fact that his biological father was an alcoholic; Bardo's own drinking at an early age, resulting in blackouts and injury to himself; Bardo's history of sexual victimization, as revealed through records, and not just uncorroborated family testimony; and Bardo's psychiatric interventions, hospitalizations, and diagnoses following his two suicide attempts. Id. at 29-31. Nevertheless, based on our review of the penalty phase testimony and the relevant records, we would conclude that the PCRA court's ultimate determination is not supported by the record. As summarized above, Bardo and his mother testified at the penalty phase regarding his biological father's alcoholism; Bardo's heavy drinking beginning in his preteen years, which his mother was unable to control and which caused him to "fall into the house" some nights; his sexual abuse at the hands of an older male in order to obtain alcohol; and his two suicide attempts. Much of the testimony presented by defense experts at the PCRA hearing was merely cumulative of the testimony provided by Bardo and his mother.

Furthermore, after thoroughly reviewing Bardo's childhood records cited by the PCRA court as missing from penalty phase consideration, see PCRA Court Opinion at 29 (citing Petitioner's Exhibits 3, 4, 5, 6, and 7), we would conclude that they do not describe a childhood home environment materially distinct from or worse than that

described by Bardo himself and his mother at the penalty hearing. For example, PCRA counsel put great emphasis on an LCCYS Case Report dated July 20, 1972, when Bardo was three years old and had been admitted, along with one of his siblings, to a day-care home. See Case Record re: Michael Bardo, dated 7/20/72, prepared by Caseworker Mariellen Fine ("1972 Bardo Case Record") (Petitioner's Exhibit 4).[13] LCCYS apparently made these day-care arrangements to assist Bardo's mother. Id. at 1. PCRA counsel emphasized the caseworker's findings that Bardo was "rather dirty" when he came daily to the home, and that "the children stated they were not being fed at home." N.T. PCRA Hearing, 11/12/09, at 348 (citing 1972 Bardo Case Record at 2). However, the document must be considered in its entirety before evaluating its possible import. Bardo's mother denied the accusation that she was not feeding her children and was said to be "extremely upset" by the charge. 1972 Bardo Case Record at 2. The caseworker further noted that Bardo was "not a very good eater" and would not eat very much; nonetheless, she described him as "of normal size and appear[ing] to be developing normally . . . [and] appear[ing] to be a normal, healthy little boy." Id. at 1-2. She also noted an attachment to and close relationship with his mother. The caseworker concluded that Bardo had made progress in the day-care home, that he enjoyed playing with the other children and going outside to play, that he talked constantly, that he was a very polite child, and that he listened attentively to instructions. Id. at 1-2. Thus, the 1972 Bardo Case Report is far from uniformly negative in describing Bardo's earliest years. As set forth in another document cited by the PCRA court, the LCCYS file on the Bardo family was closed on May 31, 1984, after fourteen

---

[13] In Bardo's Appendix to his Brief, he indicates that the date of this Case Record was April 3, 1972. This is incorrect. As is clear from the document itself, April 3, 1972, was the date that Bardo began attendance at the day-care home. The caseworker prepared the document on July 20, 1972, after she had visited the day-care home several times.

years of services.  See Letter from LCCYS to Jean McCoskey, Chief Probation Officer of the Luzerne County Juvenile Court, dated 1/16/86 (Petitioner's Exhibit 3).  The letter indicated that there had been no contact with the Bardo family since the file was closed, there was no reason given as to why the file was closed, and there is no indication from the records that the file was ever reopened.  Thus, other than clarifying that LCCYS involvement with the Bardo family ended for unspecified reasons when Bardo was fifteen, this letter offered no helpful insights, except to document that LCCYS had been involved with the Bardo family in unspecified ways for many years.

Another record cited by the PCRA court was a "Social Investigation" concerning Bardo's older brother George, dated April 3, 1981, after he had apparently been arrested for damaging a school.  See Social Investigation Re: George Bardo, dated 4/3/81 (Petitioner's Exhibit 5).  The document indicated that Bardo's mother reported as her only income $379 from Social Security, and that the family resided in a "very poorly kept" apartment, which was "dark and dirty with soiled clothing visible."  Id.  Two other documents are short and undetailed juvenile probation records with regard to Bardo, prepared when he was ages twelve and sixteen, respectively.  See Luzerne County Juvenile Probation Records, dated 4/10/82, and 6/3/85 (Petitioner's Exhibits 6 and 7, respectively).  In the first probation document,[14] the supervisor concluded that Bardo's progress had been fair, recommended that his case be closed, but cautioned that he would probably not avoid trouble in the future because his supervision at home was "terrible."  Petitioner's Exhibit 6.  As summarized in the second probation document, Bardo had been arrested on unspecified charges, and he subsequently stated that he had been drinking and was drunk at the time of his arrest; in addition, his mother stated

---

[14] Neither document indicates the nature of the offenses for which Bardo was under supervision.

that he was uncontrollable when he was drinking. Petitioner's Exhibit 7. These records, cited by the PCRA court, clearly set forth a troubled household and a troubled youth, but they do not present a picture materially different from that provided by trial counsel, through the testimony of Bardo, his mother, and school personnel.

After reviewing all the records related to Bardo's childhood environment, particularly those cited by the PCRA court as not having been presented by trial counsel, and all the testimony presented at the penalty phase and PCRA hearings, we do not dispute that Bardo's childhood was characterized by neglect, a lack of supervision, abuse, and impoverishment. However, this is not the ultimate question. Testimony presented during the penalty phase described all these aspects of Bardo's childhood and the environment in which he was raised. The expert testimony presented at the PCRA hearing was largely cumulative of that prior testimony and presented only relatively minor fresh insights. Counsel is not ineffective merely because he or she fails to present expert testimony concerning a defendant's childhood history and home life that would have been cumulative of testimony presented by a defendant's mother. See Commonwealth v. Lark, 698 A.2d 43, 51 (Pa. 1997). Thus, we would hold that Bardo's claim that trial counsel was ineffective for failing to present expert testimony concerning his childhood and the environment in which he was raised fails.

With respect to Bardo's own sexual victimization as a teenager, it is important to remember that, during the penalty phase, both Bardo and his mother testified that he had experienced sexual abuse in exchange for the provision of alcohol during his teenage years. The PCRA court determined that this abuse was "well-documented in records readily available to Trial Counsel," but was not proffered as corroborating evidence. PCRA Court Opinion at 30 (citing four documents: Petitioner's Exhibits 23, 24, and 25, and Commonwealth's Exhibit 3). However, two aspects of these records

greatly decrease their significance and import. First, with respect to Bardo's sexual abuse, the documents contain only his self-reports; thus, the four documents corroborate Bardo's penalty phase testimony only to the extent that a self-report can be corroborated by a prior self-report. See, e.g., N.T. PCRA Hearing, 11/13/09, at 563 (testimony of Dr. Berger acknowledging that there was no independent corroboration of Bardo's self-report of sexual abuse). Bardo's self-reports of sexual abuse in the documents were merely cumulative of the penalty phase testimony of Bardo and his mother.

Second, and more importantly, the documents all originated shortly after Bardo's arrest for prior sex-related offenses, i.e., the statutory rape and indecent assault of another three-year-old niece in February 1988, when Bardo was eighteen years of age, offenses to which he pled guilty. The first time Bardo disclosed the sexual abuse was during a February 27, 1988 interview with police concerning these prior sexual offenses. N.T. PCRA Hearing, 11/9/09, at 121-24 (testimony of Dr. Blumberg as to Bardo's statement to police on 2/27/88 (Commonwealth Exhibit 3)). The other three documents cited by the PCRA court likewise contain simply Bardo's self-reports of sexual abuse in the context of his psychological evaluations following his February 1988 arrest. See Multimodal Life History Questionnaire, completed by Michael Bardo, 8/12/88, (Petitioner's Exhibit 23) at ¶ 9.D.7 (in response to a request for information about any significant homosexual reactions or relationships, reporting that he "was raped when [he] was 13 by a man"); Autobiography Outline, Transitional Sex Offender Program, completed by Michael Bardo, 1988, (Petitioner's Exhibit 24) at 2, ¶ C.11 (in response to the question "who scared or humiliated you sexually? How? When?", writing "His name was Tony Koonrad. He got me drunk then raped me[.] I was about 12 years old[.]"); Intake Evaluation of Michael Bardo by Community Counseling Services of N.E. PA,

dated 7/27/88, (Petitioner's Exhibit 25) at 2 (self-report of sexual assault by a friend ten years older, beginning at age thirteen and continuing until Bardo's marriage at age seventeen); see also N.T. PCRA Hearing, 11/9/09, at 124 and 130 (Dr. Blumberg testifying that "I think we can all agree that prior to [Bardo's] being accused of molesting his niece [in 1988], he did not admit that he had been sexually assaulted himself.").[15]

Based on the above considerations, and contrary to Bardo's assertions, we would conclude that the above-cited documents at issue had only marginal value in corroborating Bardo's alleged abuse, and, in addition, were potentially highly prejudicial to Bardo. The documents serve to "corroborate" Bardo's testimonial self-report of abuse only via a similar, albeit earlier, self-report -- made in the context of a criminal offense, disturbingly similar to the instant offense. Proffering the documents as evidence, rather than simply relying on the testimony of Bardo and his mother regarding his sexual victimization, may very well have opened the door for the Commonwealth to present evidence regarding the criminal circumstances that gave rise to the documents, evidence that would have been highly prejudicial to Bardo. Not surprisingly, trial counsel made clear that he successfully sought to exclude any evidence relating to Bardo's prior sexual offense against a minor. N.T. PCRA Hearing, 11/12/09, at 388, 414-15.[16] This was a reasonable strategy. Furthermore, Bardo has not established

---

[15] As the Commonwealth notes, Dr. Berger acknowledged at the PCRA hearing that he had erroneously believed that Bardo had first disclosed his sexual victimization in a prior report from LCCYS. Commonwealth's Brief at 47 (citing N.T. PCRA Hearing, 11/13/09, at 561-63). When PCRA counsel acknowledged that there was no such prior report, Dr. Berger stated that Bardo's delayed report of abuse was an important fact to note in assessing its credibility. N.T. PCRA Hearing, 11/13/09, at 563.

[16] See also Defendant's Omnibus Pre-Trial Motion at 7-8 ¶¶ 22-24 (seeking to bar the Commonwealth from using Bardo's prior conviction for statutory rape, involuntary deviate sexual intercourse, indecent assault, and corruption of minors as evidence).

prejudice because, in our judgment, any potential additional mitigation value of his prior self-reports of sexual victimization would have been minimal, and would not have led to a different penalty verdict, particularly given the egregious aggravating circumstances of this case. Accordingly, we would conclude that Bardo's claim of trial counsel ineffectiveness for failing to proffer the 1988 documents to "corroborate" his and his mother's penalty phase testimony regarding his alleged sexual victimization fails.

Finally, with respect specifically to Bardo's psychiatric history and diagnoses, the PCRA court emphasized the "inexplicabl[e]" failure of trial counsel to present the expert testimony of Dr. Berger and Mr. Delaney, despite their having been retained by trial counsel to evaluate Bardo prior to trial. PCRA Court Opinion at 37, 40-43 (finding that trial counsel had no reasonable strategic or tactical basis for this omission). After initially evaluating Bardo in 1993, Dr. Berger did not prepare a report, but merely indicated to trial counsel that his findings would not be helpful in the guilt phase of trial, e.g., with respect to competency or defenses such as diminished capacity, guilty but mentally ill, or insanity; however, Dr. Berger also indicated that, if the trial were to include a penalty phase, he might be able to assist in some unspecified way. Trial counsel did not follow up on this possibility and apparently never re-contacted Dr. Berger. See N.T. PCRA Hearing, 11/12/09, at 488-92 (testimony of lead trial counsel, Joseph Yeager, Esq.); id., 1/13/09, at 519-23 (testimony of Dr. Berger); Letter from Dr. Berger to Mr. Yeager, dated 1/13/93 (Petitioner's Exhibit 35). Counsel testified that he had no strategic basis for not re-contacting Dr. Berger to further discuss his potential ability to assist in the penalty phase. N.T. PCRA Hearing, 11/12/09, at 489-90. Similarly, counsel testified that Mr. Delaney was not considered as an expert witness for the penalty phase, but should have been so considered. Id. at 477-84. The PCRA court concluded that Bardo established Pierce/Strickland ineffective assistance of

counsel for failing to present the testimony of Dr. Berger and Mr. Delaney with regard to Bardo's psychiatric history and diagnoses. We conclude otherwise.

Mr. Delaney was retained by trial counsel in 1993 "to determine the scope, depth and extent of Mr. Bardo's use and abuse of alcoholic beverages and concomitant impact on his behavior." 1993 Psychological Evaluation. Mr. Delaney concluded that Bardo had entered into a pattern of alcohol and drug abuse at the age of eleven, and his then-current drug of choice was beer. Id. Mr. Delaney opined that Bardo's "history and current behavior [are] consistent with the diagnostic criteria established to determine alcohol abuse." Id. at 2. Importantly, this diagnosis -- of alcohol abuse -- was the only mental health diagnosis made by Mr. Delaney.[17] We have already discussed in detail our reasons for rejecting Bardo's claim respecting the value in mitigation of alcohol-related factors, and we need not repeat that analysis.

---

[17] Mr. Delaney also listed a series of "characterological personality traits which support the diagnosis [of alcohol abuse]," including average range of intelligence; a tendency "to over simplify information fields perceived as complex or ambiguous;" restricted ability to appreciate other points of view; poorly developed problem solving skills; negative self-esteem; a tendency to dislike himself, evolving into feelings of inferiority and/or inadequacy; a lack of mature social skills; difficulty establishing and maintaining deep and intimate relationships; a guarded, constrained, and withdrawn manner; difficulty dealing with his sexuality; a tendency to act on his impulses; evasion of responsibilities; and difficulty delaying gratification and sustaining goal directed behaviors. 1993 Psychological Evaluation at 2; see also N.T. PCRA Hearing, 11/10/09, at 277 (listing same traits).

"Characterological personality traits" are not psychiatric diagnoses, and they were not presented as such. Furthermore, personality traits such as impulsiveness, evasion of responsibilities, and difficulty with delayed gratification would not necessarily be interpreted by a jury in a manner favorable to the defendant. For example, as we have previously noted, a jury might very well find that impulsiveness is an unfavorable indication of an accused's future dangerousness. See Commonwealth v. Howard, 719 A.2d 233, 238 & n.5 (Pa. 1998).

With regard to Dr. Berger, the circumstances are more complicated. Dr. Berger based his PCRA opinion testimony on his 2009 re-evaluation of Bardo and his review of Bardo's self-reports and numerous records. N.T. PCRA Hearing, 11/13/09, at 525-26, 565-66. Dr. Berger testified that he did not recall whether, following his 1993 pre-trial evaluation, he had concluded that Bardo was suffering from any psychiatric disorders. Id. at 554-55.[18]

When asked during the PCRA hearing whether Bardo suffered from mental illness at the time of the offenses, Dr. Berger answered as follows: "I believe that based on what [Bardo] told me and the history that he did. . . . I reached the opinion that [Bardo] was suffering with major depression recurrent, very possibly dysthymic, and also at the time I saw him most recently, he had some symptoms of [PTSD] and some of what he told me about the events at the time would also indicate he had symptoms of PTSD," along with alcohol abuse and long term alcoholism. Id. at 527-28. When asked whether Bardo, at the time of the offenses, suffered from an extreme mental or emotional disturbance, i.e., statutory mitigator Section 9711(e)(2), Dr. Berger answered as follows: "Again, I don't remember specifically at the time. I'm basing it on the information that I had gotten and the answer would be yes . . . [b]ased on the record review that I had indicating the previous mental health history and also the information contained [sic] from Mr. Bardo directly." Id. at 549.[19]

The records of Bardo's mental health history that Dr. Berger relied on were from Bardo's psychiatric admissions in the summer of 1985, when he was sixteen, after he

---

[18] Second chair counsel testified that, in a pre-trial phone conversation, Dr. Berger told him that Bardo was not insane and was competent, but had some sort of anti-social personality disorder. N.T. PCRA Hearing, 1/12/09, at 378-79.

[19] Dr. Berger did not suggest that the evidence satisfied any other statutory mitigators.

twice attempted suicide, and in February 1988, when he was nineteen, after his arrest for his first sexual offense against a three-year-old niece. As revealed by these records, Bardo first received psychiatric care after his first suicide attempt, which was apparently prompted by an argument and suicide pact with his girlfriend, leading both to take an overdose of medication. First Hospital Wyoming Valley, Psychiatric Admission Note, dated 7/19/85 (Petitioner's Exhibit 11); First Hospital Wyoming Valley, Social Service Assessment, dated 7/31/85 (Petitioner's Exhibit 17). Bardo's second suicide attempt, in which he cut his wrist while intoxicated after another argument with his girlfriend, occurred only weeks after the first attempt. He stated at that time that he was very depressed because his girlfriend was residing in a group home in another city. Wyoming Valley Clinic, handwritten note, dated 8/23/85 (Petitioner's Exhibit 10); First Hospital Wyoming Valley, Discharge Summary, dated 9/17/85 (Petitioner's Exhibit 18); Luzerne-Wyoming County Mental Health Center, Crisis Intervention, dated 8/23/85 (Petitioner's Exhibit 19). At the time of these 1985 suicide attempts, Bardo was diagnosed with major depression, recurrent; and conduct disorder, socialized, aggressive. First Hospital Wyoming Valley, Psychiatric Admission Note, dated 7/19/85 (Petitioner's Exhibit 11); First Hospital Wyoming Valley, Discharge Summary, dated 9/17/85 (Petitioner's Exhibit 18).

At the time of his 1988 psychiatric hospitalization, Bardo was diagnosed with a different set of psychiatric disorders: dysthymic disorder; adjustment disorder with mixed emotional features; and personality disorder, not otherwise specified ("NOS"). Wilkes-Barre General Hospital Discharge Face Sheet, dated 8/3/88 (Petitioner's Exhibit 21); Community Counseling Services of N.E. PA, Diagnosis Form, Identifying Data, dated 7/27/88 (Petitioner's Exhibit 22). In an intake evaluation for the 1988 admission, Bardo reported being depressed and having thoughts of suicide since he raped his niece.

Community Counseling Services of N.E. PA, Intake Evaluation, dated 7/27/88, (Petitioner's Exhibit 25) at 1. In this evaluation, Bardo's mental status was summarized as follows: cooperative; oriented to person, time, and place; coherent; depressed mood; intact memory; poor insight and judgment as to his current circumstances; and no indication of delusions or hallucinations. Id. at 3.

When asked at the PCRA hearing whether he could have conveyed to the sentencing jury a mitigating portrayal of Bardo, Dr. Berger responded, in equivocal fashion: "I think there were factors that I could have talked about that may have played a role, yeah." PCRA Hearing, 11/13/09, at 533. Two main factors presented by Dr. Berger are relevant to this consideration: his diagnoses that at the time of the murder, Bardo suffered from major depression and PTSD. With regard to Dr. Berger's opinion that Bardo suffered from major depression, it is instructive to consider the timing of Bardo's various psychiatric diagnoses as revealed in the records. In 1985, after his two suicide attempts within weeks of each other at the age of sixteen, which was seven years prior to the current offenses, Bardo was diagnosed with major depression and a conduct disorder. Three years later, in 1988, following the molestation of his first niece, he was diagnosed with dysthymic disorder; adjustment disorder with mixed emotional features; and personality disorder NOS; however, he was not diagnosed with major depression. Dr. Berger explained that acute episodes of major depression can occur episodically in psychiatric patients, sometimes on top of dysthymic disorder, a low-grade, chronic type of depression. N.T. PCRA Hearing, 11/13/09 at 566.[20] On this

_____

[20] All three psychiatrist-experts gave a similar definition of dysthymic disorder. As defined by Dr. Berger, dysthymic disorder is "a low-grade chronic depression. It's almost a personality characteristic. I like to describe them -- essentially, the people who are just that chronic negative depressed [sic]." N.T. PCRA Hearing, 11/13/09, at 547.

(…continued)

record, the fact that Bardo was diagnosed with major depression in 1985, but not in 1988, may have constituted evidence that Bardo was subject to acute episodes of major depression, but it did not establish that Bardo suffered such an episode in 1992, specifically at the time of the September 1992 killing.

Dr. Berger explained the basis for his diagnosis of major depression at the time of the instant offenses as follows: "[S]o I found anyway -- and this is just my opinion -- based on what [Bardo] told me[,] and also the records[,] that he was suffering from [major] depression." Id.; see also id. at 527-28. However, Dr. Berger's testimony provided no insight as to what Bardo told him in 2009 that could have informed Dr. Berger's diagnosis of major depression at the time of the offenses in 1992. See, e.g., Commonwealth v. Steele, 961 A.2d 786, 824 (Pa. 2008) (finding problematic the testimony of mental health professionals who evaluated defendant for PCRA purposes fifteen years after offenses because experts did not explain how their evaluations in 2000 led to their conclusions regarding defendant's mental status at time of offenses in

_____

(continued…)

Dr. Blumberg defined dysthymic disorder as a chronic, persistent depressive disorder of mild to moderate severity. Id., 11/9/09, at 60. Individuals with this disorder exhibit depressed mood, loss of interest in previously enjoyed activities, and "the physical or vegetative symptoms of depression," as well as "characterological depression," which means that they have impaired self-esteem, feel badly about themselves, feel inadequate and hopeless, and consider life to be "basically horrible." Id. at 65-66.

Dr. O'Brien similarly defined dysthymic disorder as "a chronic subclinical depression . . . [that is] less severe, but [is] chronic, people who are just down all of the time." Id., 11/13/09, at 657. He described individuals who suffer from dysthymic disorder as follows: "It's a glass very half empty type of person. They're always bummed out. They're always negative. There's chronic depressive quality to them." Id. at 717.

1985).  Accordingly, we would conclude that Dr. Berger's diagnosis of major depression at the time of the offenses did not have a strong evidentiary foundation.

With regard to Dr. Berger's opinion that Bardo suffered from "symptoms" of PTSD at the time of the offenses, it is important to recognize that Dr. Berger never specified what "symptoms" of PTSD he believed Bardo exhibited.  N.T. PCRA Hearing, 11/13/09 at 527-28, 559-61.  On cross-examination, Dr. Berger testified that in 2009, he found only two residual symptoms: "some nightmares of the sexual abuse and . . . avoidant behavior, where he tends to avoid newspaper articles, television shows, things like that that have sexual abuse in them."  Id. at 560.  On this record, Dr. Berger's testimony provided no insight as to how Bardo's nightmares and/or his avoidant behavior were, or could be, manifest at the time of the offenses so as to constitute an extreme mental or emotional disturbance or otherwise be deemed of significant mitigation value in the context of a case involving his indecent assault and murder of a child.

When asked about the triggering events for Bardo's symptoms of PTSD, Dr. Berger responded: "I think there are a couple of things.  First of all, I think his early childhood experiences of at least emotional neglect or abuse, as well as some physical questions of physical abuse [sic].  But more importantly, he was self reared.  This kid really had no rearing as a young child or a medium child.  And then he had a very significant homosexual sexual abuse from age 13."  Id. at 529-30; see also id. at 561.  Notably, despite three psychiatric admissions and psychiatric treatment much closer in time to Bardo's sexual victimization and other negative childhood experiences, there is no indication in any of the psychiatric records that Bardo ever experienced, reported, or was diagnosed with any symptoms of PTSD.  In contrast, a diagnosis of PTSD, or its symptoms, was rendered  only in 2008 or 2009, and only by psychiatrists retained for

PCRA purposes, decades after the alleged sexual abuse and sixteen years after the current offenses.

Dr. Berger acknowledged that several of his conclusions, specifically with regard to Bardo's sexual victimization, nightmares, and avoidant behavior, were based exclusively on Bardo's self-reports. Id. at 563-65. While we do not suggest that Bardo's self-reports should be dismissed out of hand, the lack of any corroboration or prior PTSD diagnosis, despite ample opportunities for such within the voluminous records and multiple psychiatric interventions, certainly decreases the import of Dr. Berger's retrospective conclusions based exclusively on Bardo's self-reports.

If trial counsel had called Dr. Berger to testify at the penalty phase hearing, the jury would have had the responsibility to determine the credibility and weight to be afforded his testimony.[21] Of course, Dr. Berger's testimony would not have gone to the jury unchallenged. The Commonwealth would have had the opportunity to inquire into the basis of his opinions via cross-examination, and to proffer its own expert. Indeed, at the PCRA hearing, on cross-examination, the Commonwealth strongly challenged Dr. Berger's opinion testimony and proffered the testimony of Dr. O'Brien, who offered an alternative view of Bardo's mental state.

Specifically, Dr. O'Brien found no evidence that Bardo suffered from depression either in 2009 or in 1992 at the time of the murder. PCRA Hearing, 11/13/09, at 601-06, 633, 657-58, 664-65. Dr. O'Brien noted that, at the time of his 2009 interview, Bardo had received no psychiatric treatment for fourteen years, and opined that there had been no treatment because Bardo manifested no symptoms and thus no treatment was needed. Id. at 610, 622-23, 658-59. Dr. O'Brien further opined that Bardo had experienced clinically significant depression only during two periods of his life: after his

---

[21] The PCRA court did not make an assessment of Dr. Berger's credibility.

arrests for each of the sexual assaults against his nieces. Id. at 638-39, 664, 716-17. Consistent with Dr. O'Brien's opinion, the records showed that Bardo had never been treated with psychotropic medication until after his arrest for the first sexual assault of one of his nieces, and then he was similarly treated for a time after his incarceration for the current offenses. Id. at 622-23, 658. Dr. O'Brien also rejected the diagnosis of dysthymic disorder, which, he explained, is a chronic depression in which the affected individual has "a chronically depressed mood that occurs most of the day, more days than not, for at least two years," and experiences "clinically significant distress or impairment in social, occupational . . . or other important areas of functioning." Id. at 657, 659. Dr. O'Brien found no evidence that Bardo exhibited any such clinically significant distress or impairment in the two years prior to the offenses, which was the most stable and quiet period of Bardo's life, when he was continuously employed full time, functioning, not hospitalized, and undergoing counseling related to his prior offense; furthermore, although he was continuing to use alcohol socially, there was no evidence that it was impairing his ability to function or was escalating. Id. at 659-60; 614-15, 625, 642, 649.

With regard to PTSD, Dr. O'Brien also had a very different opinion than Dr. Berger. Dr. O'Brien did not find any symptoms of PTSD attributable to Bardo's sexual abuse as a teenager; furthermore, he discerned no evidence of any symptoms of PTSD prior to Bardo's arrest for the current offense, a conclusion entirely consistent with the record. Id. at 609-12, 643, 650, 653-57. The only PTSD symptom that Dr. O'Brien detected in Bardo was avoidance, i.e., attempts to distract himself, to keep busy, to not think about the current offenses and his resulting circumstances. Id. at 611, 652, 702. It is important to emphasize that Dr. O'Brien's observation of Bardo's avoidance was related to the current offense, and not, as Dr. Berger had opined, to his teenage sexual

abuse. Consistent with his view of Bardo's avoidance behavior, Dr. O'Brien opined that the current offense was "the most traumatic thing [Bardo] has experienced," causing him a great deal of emotional and traumatic upset. Id. at 611, 622-23, 643, 650. Nonetheless, Dr. O'Brien concluded that Bardo's sole symptom of avoidance was not sufficient to warrant a PTSD diagnosis. Id. at 611, 643.

Based on his review of the record, his evaluation of Bardo in 2009, Bardo's lack of need for psychiatric treatment for the preceding fourteen years, as well as the facts of the case, Dr. O'Brien also concluded that Bardo was not suffering from an extreme mental or emotional disturbance at the time of the offenses. Id. at 714. Thus, the testimony of Dr. O'Brien, whom the PCRA court found credible, see PCRA Court Opinion at 34, serves as a strong counterbalance to Dr. Berger's opinion of Bardo's psychiatric history and diagnoses, and their manifestation at the time of the offenses. All of the above considerations must enter into the re-weighing on collateral review of the totality of the mitigating and aggravating factors in this case. After careful review and consideration of Dr. Berger's testimony and the above-summarized records on which he relied, we would conclude that Dr. Berger's testimony did not support a finding that Bardo's psychiatric problems were manifest at the time of his offenses, such as would have led to an extreme mental or emotional disturbance, pursuant to 42 Pa.C.S. 9711(e)(2); thus, we cannot conclude that any reasonable juror would have found this statutory mitigator, much less assigned determinative weight to it. We acknowledge that it is reasonably probable that one or more jurors may have found that Bardo's psychiatric history and diagnoses constituted a mitigating factor pursuant to the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). However, upon reweighing the mitigating and aggravating circumstances in light of Dr. Berger's PCRA testimony as to Bardo's psychiatric history and diagnoses, we would not conclude that the additional evidence of

mitigation would have caused any reasonable juror to conclude that the mitigating factors balanced or outweighed the aggravating circumstances. Again, we view the aggravating factors in this case as particularly egregious: the murder of a three-year-old child by strangulation, involving forceful pressure to and deliberate compression of her neck over a period of approximately four to five minutes until after she lost consciousness, while perpetrating an indecent assault of the child that caused a four-millimeter tear to her vagina, pain, and bleeding. N.T. Guilt Phase, 1/26/93, at 368-92 (supporting aggravating factors 42 Pa.C.S. 9711(d)(6) and (d)(16)). See Gibson II, 19 A.3d at 531 (citing Commonwealth v. Lesko, 15 A.3d 345, 383-84 (Pa. 2011), for proposition that "where there is substantial aggravation, it may be particularly difficult to prove Strickland prejudice based on additional mitigation submitted at the post-conviction stage").

We recognize that, in formulating his opinion concerning the mitigating circumstances relevant to Bardo's offense, Dr. Berger relied on the totality of his psychiatric diagnoses of Bardo, including his diagnoses not only of depression and symptoms of PTSD, but also of alcohol abuse and dependence, as well as his consideration of Bardo's childhood home environment and social background. See N.T. Penalty Phase, 11/13/09, at 549 (Dr. Berger testified that the basis of his opinion that Bardo suffered from an extreme mental or emotional disturbance at the time of the offenses was "the record review that I had indicating the previous mental health history and also the information contained [sic] from Mr. Bardo directly"). Our analysis above has addressed these diagnoses and factors separately. However, we have also considered their import collectively, and, for all the reasons explained above, we would reach the same conclusions.

We also recognize that additional testimony concerning Bardo's psychiatric history and diagnoses was presented at the PCRA hearing by Dr. Blumberg. Of course, Bardo is not entitled to relief merely because PCRA counsel proffered the testimony of a different psychiatrist, who reached overlapping but distinct conclusions and diagnoses from those of the psychiatrist consulted by trial counsel. Nothing in the law at the time of trial in 1992, or at present, suggests that trial counsel is ineffective merely because he or she did not consult with and present the testimony of several mental health professionals with overlapping but not entirely consistent opinions.[22]

Furthermore, after carefully reviewing Dr. Blumberg's testimony, we would conclude that it was, in total, no more helpful in mitigation than Dr. Berger's testimony, and the disagreements between them with regard to particular diagnoses and applicable statutory mitigating factors tend to vitiate the import of both. In sum, Dr. Blumberg summarized largely the same points as did Dr. Berger from the records of Bardo's childhood, home environment, social history, and previous psychiatric interventions and diagnoses. Based on his review of the records and on his evaluation of Bardo in 2008, Dr. Blumberg suggested several diagnoses, which overlapped with, but in some instances were distinct from, those suggested by Dr. Berger.

---

[22] Trial counsel's conduct must be viewed in light of governing law in 1992. Current Pennsylvania standards with respect to counsel's duty to develop mitigating evidence are more exacting than in 1992, but counsel's effectiveness should not be measured by subsequently developed standards. See, e.g., Cullen v. Pinholster, ___ U.S. ___, ___, 131 S.Ct. 1388, 1407 (U.S. 2011); Bobby v. Van Hook, 558 U.S. 4 (2009). In this case, the evolution of the standards for counsel's performance does not seem to be of determinative significance. The PCRA court credited counsel's testimony that he had no strategic reason for not pursuing Dr. Berger's pre-trial determination that he might be able to assist in the penalty phase. The focus in this appeal is on whether Bardo was prejudiced by counsel's failure to follow-up with Dr. Berger regarding his potential mitigation testimony.

For example, Dr. Blumberg concluded, in contrast to Dr. Berger, that Bardo did not suffer from major depression at the time of the current offenses. N.T. PCRA Hearing, 11/9/09, at 18-19, 161; Blumberg Affidavit at ¶ 36. Dr. Berger acknowledged that "[w]e have a difference of opinion, absolutely," N.T. PCRA Hearing, 11/13/09, at 567, but there was no exploration of the possible reasons for the difference. Notably, the PCRA court erroneously found that both Dr. Blumberg and Dr. Berger diagnosed Bardo with major depression. PCRA Court Opinion at 32 n.20. Dr. Blumberg also opined that Bardo was intoxicated at the time of the offenses, an opinion that Dr. Berger did not appear to share, or at least was more equivocal about. N.T. PCRA Hearing, 11/9/09, at 18-19, 40, 94-96, 108-09, 144-45; id. at 11/13/09, at 528, 538-39. Such differences of opinion would not likely enhance the case for mitigation, but rather could diminish the import of both psychiatrists' testimony.

Turning to Dr. Blumberg's opinion that, at the time of the offenses, Bardo suffered from chronic PTSD, id. at 18-19, we have already discussed the numerous questions surrounding Dr. Berger rendering a similar opinion. Dr. Blumberg's testimony contributes little to the resolution of these questions. To support his PTSD diagnosis, Dr. Blumberg, like Dr. Berger, relied on Bardo's self-reports that he had suffered sexual abuse as a teenager, as well as on Bardo's self-reports of his symptoms. N.T. PCRA Hearing, 11/9/09, at 20, 73-88.[23] However, undermining his own reliance on Bardo's self-reports, Dr. Blumberg repeatedly emphasized the importance of documenting an individual's self-reports in order to ensure their accuracy. Id. at 15 ("[I]t is essential to have other documentation about the individual so that you could either confirm or refute

---

[23] Although Dr. Blumberg testified that there were records indicating that Bardo was sexually abused as a child, see N.T. PCRA Hearing, 11/9/09, at 20, those records are Bardo's self-reports of abuse made shortly after he was arrested for the sexual assault of his niece in 1988.

what they [sic] are reporting to you" and "Obviously, I don't want to rely just on what a Defendant is telling me because it may or may not be accurate."); id. at 21 ("[I]t is essential to try to have other sources of data that can either confirm or refute what a Defendant tells you about their [sic] background, their [sic] growing-up experiences."). On cross-examination, Dr. Blumberg acknowledged that Bardo had told him that the symptoms he had experienced from his sexual abuse as a teenager had "faded" after three to four years, i.e., when he was nineteen or twenty years of age, which was three years prior to the current offenses. Id. at 158-59. It is not clear if Dr. Blumberg accepted or rejected this self-report, but, in any event, the severity of any symptoms of PTSD that Bardo may have experienced at the time of the current offenses, as evaluated seventeen years later, is impossible to assess from the records and remains unclear from Dr. Blumberg's testimony.

In addition, Dr. Blumberg listed a series of eight traumatic events, all self-reported by Bardo, that may have served as triggering events for PTSD. Id. at 88, 152-53. Dr. Blumberg opined that the most serious event was Bardo's teenage sexual abuse, but suggested further that other events could also have served as triggers, including physical abuse within the family, an auto accident, an accident at work or home, threats of injury or injury at the hands of another, and some other experience causing serious injury or fear of serious injury or death. Id. at 88, 152-53. Apparently, when Dr. Blumberg provided him with a diagnostic self-reporting questionnaire, Bardo claimed to have experienced all the types of traumatic events listed. Id. at 152-54. While Dr. Blumberg testified that an individual is more likely to develop PTSD when exposed to more types of different traumatic events, id. at 88, he acknowledged that he had not asked specific questions about most of the incidents Bardo reported as traumatic; hence, the timing and severity of most of Bardo's self-reported traumatic

events were unexplored. Id. at 154. Dr. O'Brien challenged Dr. Blumberg's use of the self-reporting questionnaire, as well as his conclusions regarding Bardo's PTSD symptoms and stressors: "I think that the diagnostic criteria [for PTSD] require[ ] a certain amount of specificity in terms of identifying, not only what the symptoms are with specificity, but [also that] they're linked to the alleged trauma, the reported trauma[,] and also the trauma has to be of a certain severity. It's not just any trauma." N.T. PCRA Hearing, 11/13/09, at 652. Thus, for all these reasons, Dr. Blumberg's opinions regarding a PTSD diagnosis had no greater mitigation value than the similar opinions of Dr. Berger.

Dr. Blumberg also diagnosed Bardo with personality disorder NOS, with schizoid, depressive, and inadequate features, with schizoid meaning emotionally withdrawn, and depressive indicating chronic feelings of inadequacy and proneness to become quite depressed. N.T. PCRA Hearing, 11/9/09, at 70. Dr. Blumberg explained that the personality disorder diagnosis "is trying to make reference to his impaired thinking, his impaired interpersonal relationships, his impaired social functioning that is characterized primarily by his being a loner, by his being inadequate, by [h]is being chronically depressed and essentially an inept individual." Id. at 167. Dr. Blumberg further explained that the personality disorder diagnosis "also impacts on [Bardo's] impulse control and his ability to think before acting on things. Basically his inability to tolerate stressful events [sic]." Id. at 70. While these characteristics certainly suggested a maladjusted individual, it is far from clear how their manifestation at the time of the offenses could constitute supporting evidence for the statutory mitigators at 42 Pa.C.S. § 9711 (e)(2) or § (e)(3), i.e., that, at the time of the offenses Bardo was under the influence of extreme mental or emotional disturbance, or was substantially impaired in

his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. See discussion infra.

In addition, Dr. Blumberg clarified that the personality disorder diagnosis overlaps with most of Bardo's other diagnoses. N.T. PCRA Hearing, 11/9/09, at 168; see also id. at 65-66 (Dr. Blumberg testifying that dysthymic disorder is "associated with characterological depression," which means that individuals with this condition "have persistently impaired self-esteem . . . feel badly about themselves . . . feel inadequate . . . feel hopeless . . . feel like life is basically horrible[,] and [ ] these thoughts and feelings have persisted . . . from early on and it becomes sort of a part of their character makeup"); id. at 160-61. Dr. O'Brien expanded on the overlap of diagnoses, opining that Dr. Blumberg's diagnosis of dysthymic disorder was "a redundancy" to his diagnosis of personality disorder NOS with depressive features; Dr. O'Brien saw no reason to offer multiple different diagnoses of the same symptom. Id., 11/13/09, at 665. Given Dr. Blumberg's description of Bardo's personality disorder NOS, his failure to link it to the statutory mitigators at Sections 9711(e)(2) or (e)(3), his acknowledgment of overlap with Bardo's various other diagnoses, Dr. O'Brien's testimony, and Dr. Berger's failure to render a diagnosis of personality disorder, we cannot conclude that Dr. Blumberg's diagnosis of personality disorder NOS would have had a significant additional mitigating impact had it been presented to the jury.

Dr. Blumberg also diagnosed Bardo with pedophilia. N.T. PCRA Hearing, 11/9/09, at 18-19, 82-85, 161-66. However, trial counsel testified that "[pedophilia] is a word that I would never want introduced in this trial," as counsel did not "see how showing Mike Bardo was a pedophile is going to [ ] help him." Id., 11/12/09, at 413-14. Trial counsel also testified to his concern that introducing the diagnosis of pedophilia would open the door to admission of Bardo's prior molestation of another three-year-old

niece. Id. at 414-15. We cannot conclude that counsel's view was unreasonable. See Commonwealth v. Edmiston, 851 A.2d 883, 892-93 (Pa. 2004) (counsel not ineffective for making tactical decision against presenting psychiatric expert testimony that defendant was a pedophile, based on counsel's fear that jury would tend to regard pedophilia as more of an aggravating factor than a mitigating one).

Finally, Dr. Blumberg opined that the combination of Bardo's mental disorders supported the applicability of two statutory mitigating factors: extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2); and substantial impairment in the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, id. § 9711(e)(3). N.T. PCRA Hearing, 11/9/09, at 19, 91-98. However, on cross-examination, Dr. Blumberg acknowledged that Bardo's actions just prior to and at the time of the murder showed that Bardo "recognized that he was doing or engaging in some inappropriate conduct," and that Bardo had "a basic appreciation of what he was doing;" nonetheless, Dr. Blumberg opined that such recognition and appreciation were consistent with substantial impairment at the time of the offense. Id. at 173-74; see also id. at 175-81. The PCRA court tried to clarify the question of degree of impairment with the following general query to Dr. Blumberg: "From [sic] someone who is, let's say a lay person, what is the difference [between] being impaired [and being] substantial[l]y impaired]?" Dr. Blumberg responded that the degree of impairment could not be determined via an objective scale, but rather was a professional opinion or judgment call, rendered by an expert based on knowledge, training, and experience. Id. at 194-95.

Ultimately, of course, it is a jury's responsibility to assess the credibility of an expert's opinion and to determine whether the evidence supports the applicability of any statutory mitigating factors. Here, we do not believe that the jury's inclination to find one

or more statutory mitigators would have been strengthened by Dr. Blumberg's various summary statements concerning Bardo's mental status and the manifestation of his combined psychiatric diagnoses. Indeed, Dr. Blumberg's statements in some instances contradict his ultimate opinion that Bardo was substantially impaired at the time of the offenses in his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. For example, Dr. Blumberg stated:

> [Bardo] feels inadequate, he feels inept, he feels likely to be rejected by a same-age partner, and not only felt sexually aroused but I think psychologically more comfortable with someone who is much younger, much more dependent, much less likely to reject him or his attention.

N.T. PCRA Hearing, 11/9/09, at 84. The doctor added:

> That [Bardo's] chronic depression, again, is something that underlined his whole sense of self, feeling inadequate, helpless, depressed, as if a failure in his life, and that has been a chronic and significant impediment throughout his life.
>
> *       *       *       *
>
> And then you have also the underlying personality disturbance in which through all of the abuse and neglect of growing up impacted on [Bardo's] sense of self, interacted on his thinking about himself and the world, his emotions, his chronic depression, his inability to develop a long-term stable relationship with another adult. And apparently the only way that he would have an interaction with somebody would be with somebody who was much younger, much more helpless, much more vulnerable to whom he found himself very sexually attracted.
>
> *       *       *       *
>
> [Bardo] has extremely impaired self-esteem. He goes through periods of depressed mood when he thinks about his past, his background, and he numbs himself with alcohol,

which further impairs his functioning. He has difficulty maintaining relationships with other people.

He is kind of a loner, inept, anticipates the world is a rejecting place. He is a chronically depressed and inadequate guy and, you know, his life is -- he has not held any great jobs. He's done poorly in school. He essentially failed at most everything that he has attempted and, you know, then he even gets drunk and molests his niece.

\* \* \* \*

[The features of personality disorder NOS] were consistent with [Bardo] being basically immature, inept, inadequate, a loner . . . .

\* \* \* \*

[The diagnosis of personality disorder NOS] is trying to make reference to [Bardo's] impaired thinking, his impaired interpersonal relationships, his impaired social functioning that is characterized primarily by his being a loner, by his being inadequate, by his being chronically depressed and essentially an inept individual.

Id. at 95-96, 160-61, 166-67.

These observations, that Bardo was a generally depressed, inept, immature loner who had often failed, felt inadequate, had low self-esteem, and was unable to sustain adult relationships do not constitute evidence that, at the time of the offenses, he was substantially impaired in the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, 42 Pa.C.S. § 9711(e)(3), or was under the influence of extreme mental or emotional disturbance, id. § 9711(e)(2). Likewise, Dr. Blumberg's view that Bardo felt "more comfortable" and would only have an "interaction" with someone who was much younger, dependent, helpless, vulnerable, and unlikely to reject his attention, and to whom he was sexually attracted, does not constitute evidence supporting these statutory mitigators. Furthermore, we agree with

the Commonwealth that this evidence might well have been perceived by the jury as more prejudicial than mitigating. See Commonwealth Brief at 56.

Having reviewed the entirety of Dr. Blumberg's PCRA testimony, we believe it is highly unlikely that any juror would have found either the Section 9711(e)(2) or the Section 9711(e)(3) statutory mitigator, and, in our view, the PCRA court erred in finding otherwise. Our conclusion is based on the facts of this case, Dr. Blumberg's acknowledgment that Bardo had a basic appreciation of what he was doing at the time of the offenses, Dr. Blumberg's statements concerning Bardo's mental status and personality characteristics, and the lack of any evidence upon which to ground a finding that his mental status at the time of the offenses supported the applicability of either the § 9711(e)(2) or § 9711(e)(3) statutory mitigators. However, as with Dr. Berger's testimony, Dr. Blumberg's testimony was reasonably likely to have caused one or more jurors to find that Bardo's psychiatric history and diagnoses constituted mitigating circumstances under the catchall mitigator of Section 9711(e)(8). Nevertheless, upon re-weighing the mitigating and aggravating factors, we would not conclude that any additional evidence of mitigation discerned in Dr. Blumberg's PCRA testimony would have caused any reasonable juror to conclude that the mitigating factors balanced or outweighed the egregious aggravating factors in this case.

In sum, based on our thorough review of the documents of record, the penalty phase hearing, and the PCRA hearing, we would reverse the PCRA court's order insofar as it granted Bardo a new penalty phase hearing. First, the PCRA court's findings were, in some important respects, not supported by the record. Furthermore, in our view, the PCRA court considered only the new evidence in mitigation before it at the collateral phase and did not re-weigh the totality of the evidence in mitigation against

the egregious aggravating factors present in this case. Having corrected these errors, we would reverse the PCRA court's grant of a new penalty phase hearing.[24]

---

[24] In Commonwealth v. Martin, 5 A.3d 177 (Pa. 2010), a case with some similarities to this case, the Court affirmed the PCRA court's grant of a new penalty phase hearing based on trial counsel's ineffectiveness in failing to investigate and present mitigating evidence that Martin had been diagnosed with mental illnesses that affected him before, during, and after he murdered a homosexual male who had made sexual advances to him.

During the penalty phase, Martin's mother testified that he had started using drugs at an early age; had been sexually abused by an uncle who was later convicted of the molestations; and had undergone psychiatric treatment during several periods of his life. Trial counsel did not present the testimony of, or even consult with, any mental health experts as to potential mental health mitigation evidence. The jury found no mitigating circumstances and three aggravating circumstances, and accordingly, determined that Martin should be sentenced to death. Id. at 197-98.

At the PCRA hearing, Martin presented the testimony of two mental health experts who had treated him for years prior to the murder, and he presented his mental health records. This evidence established that, from age fifteen until after the murder, which he committed at age twenty-one, Martin suffered from PTSD and depression, due to repeated sexual molestations by his uncle. A third mental health expert, who evaluated Martin after the murder, opined that due to Martin's PTSD and depression which, importantly, had resulted from his prior sexual abuse, the male victim's sexual advances immediately prior to the murder had placed Martin under the influence of extreme mental or emotional disturbance, thus supporting the statutory mitigator at 42 Pa.C.S. 9711(e)(2). This expert further opined that the Section 9711(e)(3)statutory mitigator was also applicable for the same reasons. 5 A.3d at 198-99.

Affirming the PCRA court's grant of a new penalty phase hearing, the Court held that the PCRA court's factual determinations were supported by the record and that the PCRA court had correctly concluded that Martin was prejudiced as a matter of law. Id. at 203-04. As we have reiterated in that case, each capital case challenging trial counsel's effectiveness for failing to present sufficient mitigation evidence must be analyzed considering the facts presented, including the defendant's unique life history. Id. at 196. While Martin and the instant case have some superficial factual similarities, we believe there are sufficient material distinctions to warrant a different outcome.

## II.    Bardo's Appeal (650 CAP)

We turn now to Bardo's appeal, where he raised the following issues:

I. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process, reliable sentencing and effective assistance of counsel under the federal and state constitutions because prejudicial pretrial publicity tainted the entire venire panel and counsel failed to pursue a change of venue on that basis.

II. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process, reliable sentencing and effective assistance of counsel under the federal and state constitutions by the erroneous admission of victim impact evidence.

III. Whether the PCRA Court erred in denying Bardo's claim that he was denied effective assistance of counsel under the federal and state constitutions because counsel failed to adequately investigate a viable voluntary intoxication defense and, through expert testimony, present that defense at the guilt and penalty phases.

IV. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process, reliable sentencing and effective assistance of counsel under the federal and state constitutions because the Commonwealth violated its obligations under Brady v. Maryland by failing to disclose mitigating information about Bardo and his family that was contained in Luzerne County Children and Youth Services records and in failing to reach Bardo's claim that he was denied effective assistance of counsel because counsel failed to adequately seek and obtain such records.

V. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process, reliable sentencing and effective assistance of counsel under the federal and state constitutions because the trial court improperly incorporated guilt phase evidence into the penalty phase without objection by counsel.

VI. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process, reliable sentencing and effective assistance of counsel under the federal and state constitutions because the trial court gave erroneous instructions on the nature and use of mitigating evidence and failed to correct misleading closing arguments by the Commonwealth without objection by counsel.

VII. Whether the PCRA Court erred in denying Bardo's claim that he was denied due process and effective assistance of counsel under the federal and state constitutions because of the cumulative effect of all errors.

Bardo's Brief at 2-3 (reordered for ease of disposition).

In his first claim, Bardo asserts that trial counsel was ineffective for failing to seek a change of venue based on allegedly inflammatory and pervasive pretrial publicity about the facts of the case, including his confession and his history of child molestation. Bardo's Brief at 63. Bardo acknowledges that trial counsel did include a request for a change of venue in his omnibus pretrial motion, but maintains that counsel was ineffective because he withdrew the motion days later without obtaining a ruling from the trial court. Id. at 69. In response, the Commonwealth relies on the *voir dire* record to argue that none of the empanelled jurors had formed a fixed opinion as to Bardo's guilt or innocence and all had affirmed that they would base their decision solely on the evidence presented in the courtroom. Commonwealth's Brief at 34-35. The Commonwealth also cites the court's extensive instructions to the jury panel during *voir dire*. Id. at 35 (quoting N.T. Voir Dire at 8-9). Finally, the Commonwealth cites excerpts of the PCRA hearing in which lead trial counsel testified that the motion for a change of venue had been withdrawn without prejudice to be refiled if seating a jury in Luzerne County had proven impossible, and that the defense was satisfied with the process of *voir dire* and found it to be fair. Id. at 36-37 (citing N.T. PCRA Hearing, 11/12/09, at 494-96).

The PCRA court denied Bardo's claim of trial counsel ineffectiveness for failing to file a second motion for change of venue, holding that Bardo had failed to establish the performance or prejudice prongs of the Strickland/Pierce standard. PCRA Court Opinion at 9-13. As the PCRA court noted, this Court reviewed the law applicable to requests to change of venue in Commonwealth v. Briggs, 12 A.3d 291 (Pa. 2011).

> A change in venue is compelled whenever a trial court concludes a fair and impartial jury cannot be selected from the residents of the county where the crime occurred. As a general rule, for a defendant to be entitled to a change of venue because of pretrial publicity, he or she must show that the publicity caused actual prejudice by preventing the empanelling of an impartial jury. The mere existence of pretrial publicity alone, however, does not constitute actual prejudice. Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service … .

> * * * *

> [T]he pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial.

> Nevertheless, our Court has recognized that there are some instances in which pretrial publicity can be so pervasive and inflammatory a defendant does not have to prove actual prejudice. Prejudice will be presumed whenever a defendant demonstrates that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial

reports. However, if the defendant proves the existence of one or more of these circumstances, a change of venue will still not be compelled unless the defendant also demonstrates that the presumptively prejudicial pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. With respect to the determination of whether there has been an adequate cooling off period to dissipate the effect of presumptively prejudicial media coverage . . . [a] court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. . . . Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

Id. at 313-14 (internal quotation marks and citations omitted); see id. at 313 ("trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change" in venue, and therefore trial court's decision will not be overturned absent an abuse of discretion) (citations omitted).

Here, the PCRA court assumed that the pretrial media coverage of Bardo's offenses and his case could have fallen within the definition of "presumptively prejudicial" set forth in Briggs. PCRA Court Opinion at 11. However, it concluded that the record did not show either that the presumptively prejudicial pretrial publicity was so extensive, sustained, and pervasive as to saturate the community or that the cooling off period had been insufficient. Id. (citing Briggs). Contrary to Bardo's assertions, the fact that nearly all of the venire members had heard something about his case did not establish media saturation of the community, and the fact that the trial commenced

somewhat less than five months after the crime did not establish that the cooling off period was insufficient. Id. at 12. Accordingly, the PCRA court held that Bardo had failed to show that trial counsel was ineffective for not filing a second change of venue motion.

In addition, the PCRA court concluded that Bardo was not prejudiced by trial counsel's decision not to file a second change of venue motion. The PCRA court explained its ruling as follows:

> The media coverage was extensively addressed during *voir dire*, and any potential jurors indicating a fixed opinion as a result of media exposure were dismissed for cause. More importantly, each empanelled juror affirmed the absence of any fixed opinion as a result of media coverage and that such would render their decision based solely upon the evidence presented at trial. [deleting citation to numerous portions of the *voir dire* transcript]. [As set forth in the trial court's] post-verdict Opinion issued on November 10, 1994[,] . . . a review of the record reveals no prejudicial error during *voir dire*. Counsel were given considerable latitude during the process, and [all jurors] who [were] accepted indicated they could and would give the defendant a fair and impartial trial, they had no fixed opinions, and they could and would decide the issues in this case based solely upon the evidence presented in the courtroom. . . . [T]he trial judge is in the best position to assess the prospective juror's potential bias and partiality, and the undersigned[25] determined that each juror would be impartial. We also note that Bardo failed to exhaust his peremptory challenges and, therefore, could articulate no prejudice. Additionally, the jury was emphatically instructed [that its] decision was to be rendered "on the basis of the facts as they have been presented to you by the evidence, and on absolutely nothing else." N.T. Trial[, 1/27/93, at] 630-31. Pennsylvania law presumes the

---

[25] The Honorable Patrick J. Toole presided over both Bardo's trial and his PCRA hearing.

jury has followed the trial court's instructions. For these reasons, we conclude Bardo has failed to establish prejudice pursuant to the Strickland/Pierce test, and this claim is denied.

Id. at 12-13 (footnote added).

The PCRA court's findings and holding are supported by the record; accordingly, we will not disturb the court's denial of Bardo's first ineffectiveness claim.

In his second issue, Bardo claims that trial counsel was ineffective for failing to object when "[t]he prosecution improperly injected victim impact considerations into the guilt and penalty phases of the trial by eliciting irrelevant evidence whose only purpose was to create sympathy for the victim's mother, Cathy Bardo." Bardo's Brief at 86.[26] The evidence that Bardo challenges is the direct examination testimony of Ms. Bardo, which, he argues, was not relevant and "was tantamount to victim impact testimony." Id. at 87-88. Claiming constitutional error, apparently based on an alleged denial of due process, Bardo seeks a new trial. Id. at 86, 89. The challenged testimony, in its entirety, is as follows.

Prosecutor: What did you do the rest of that day [September 4, 1992, the day of the murder]?

Witness: Looked for her [the victim].

Prosecutor: Where?

Witness: I looked for [the victim].

Prosecutor: Where?

Defense Counsel: Objection.

---

[26] In this issue, Bardo also asserts claims of prosecutorial misconduct and trial court error, but these iterations are waived as they could have been raised at trial or on direct appeal and were not. 42 Pa.C.S. § 9544(b).

Court:  Overruled.

Defense Counsel:  I don't think it's relevant.

Court:  I'll allow it.

Witness:  All over.  I went door to door, through Lee Park and through Wilkes-Barre there, just went calling for her.

Prosecutor:  You didn't find her?

Witness:  No.

Prosecutor:  Can you tell the jury how you found out when [the victim] was found?

Witness:  The next morning I was coming -- I was going back over to my mother's after looking for her all night.  I stopped at a store for coffee and a pack of cigarettes.  And some lady come walking in the door, yelling that they found that baby that was missing, they found her in the creek in a garbage bag.

N.T. Trial, 1/25/93, at 112-13 (quoted in Bardo's Brief at 87).

Although Bardo asserts -- inaccurately -- that counsel failed to object to the above testimony, he subsequently acknowledges that counsel objected "to part of Cathy Bardo's prejudicial testimony based on relevance grounds, but did not raise with the trial court the fact that her testimony was a *de facto* victim impact statement and did not object to all of the offending testimony."  Bardo's Brief at 88.  The Commonwealth argues, and the PCRA court held, that the challenged testimony did not constitute victim impact evidence, but rather was part of the full picture and chronology of the crime, and was properly admitted as such.  Commonwealth's Brief at 48-49; PCRA Court Opinion at 16.  Following review of the record, we conclude that the PCRA court did not err in rejecting this ineffectiveness claim.

Victim impact evidence is "designed to show each victim's uniqueness as a human being." Commonwealth v. Flor, 998 A.2d 606, 633 (Pa. 2010) (quoting Payne v. Tennessee, 501 U.S. 808, 823 (1991)); see also id. ("[V]ictim impact testimony conveys to the jury that the decedent was a unique individual whose loss affects society.") (citation omitted). Victim impact evidence encompasses information concerning the victim and the impact that the death of the victim has had on his or her family, which is not otherwise relevant to the proceeding. Id. at 634; Commonwealth v. Rios, 920 A.2d 790, 806-07 (Pa. 2007). At the time of Bardo's trial, victim impact evidence was completely barred from criminal proceedings. Id. at 806.[27]

However, "a criminal defendant does not have the right to have all evidence presented against him at trial sanitized of anything that could cause jurors to sympathize with the victim or [her] family." Id. at 807. Rather, the jury must be presented with a full picture of the offenses charged in order to aid in the jury's understanding of the development and nature of those offenses. Id.; Commonwealth v. Saranchak, 675 A.2d 268, 275 (Pa. 1996). Furthermore, rulings on the admission of evidence are within the discretion of the trial court. Flor, 998 A.2d at 634.

Here, we agree with the PCRA court that the challenged testimony "is simply not victim impact evidence." PCRA Court Opinion at 15. The testimony did not concern the victim or the impact of the victim's death on her family, and thus counsel cannot be faulted for failing to object to it as victim impact evidence. Also, as the PCRA court

---

[27] Prior to amendment of the Pennsylvania Sentencing Code in 1995, victim impact evidence was deemed inadmissible at any stage of a capital trial. On October 11, 1995, the General Assembly amended the Sentencing Code to permit the admission of victim impact evidence during the penalty phase. See 42 Pa.C.S. § 9711(a)(2). See also Commonwealth v. Means, 773 A.2d 143, 147-53 (Pa. 2001) (Opinion Announcing Judgment of Court) (describing background and history). As Bardo's trial took place in 1993, no victim impact evidence was permitted, either in the guilt or penalty phase.

explained, the testimony was "part of the chronology of the crime charged in this case." Id. The record supports this additional point. Just before the challenged portion of Ms. Bardo's testimony, she had testified that, when she learned that her daughter was missing, she had run to the nearby creek, crying and yelling her daughter's name. As she was running through the creek, Bardo had grabbed her shoulder, knocked her down, and told her to stop looking because she would not find her daughter there. N.T. Trial, 1/25/93, at 109-10. The victim's body was later found in that creek, and Ms. Bardo related how and when she had learned of that discovery. Id. at 111-13. Ms. Bardo's testimony provided the jury with an account of Bardo's actions toward her after the murder, and thus could help the jury to develop a more complete understanding of the offenses. We therefore agree with the PCRA court that there is no merit to Bardo's assertion that trial counsel was required to raise a victim impact objection to Ms. Bardo's testimony.

In his third claim, Bardo asserts that counsel was ineffective for failing to investigate and present a voluntary intoxication defense. Bardo asserts that trial counsel should have proffered expert testimony to establish that Bardo was legally intoxicated at the time of the offenses, and therefore his judgment and impulse control were impaired, suggesting that he was not able to form the specific intent to kill. Bardo's Brief at 51, 53. The Commonwealth maintains that there was no evidence whatsoever, and thus no basis for a finding, that, at the time of the offenses, Bardo was intoxicated to the point of losing his faculties and sensibilities, which is the relevant standard. Commonwealth's Second Brief at 11.

After summarizing and analyzing the PCRA testimony of Bardo's two experts on the subject of voluntary intoxication, the PCRA court declined to grant relief. Bardo's experts estimated Bardo's blood alcohol level at the time of the offenses to have been

.10% or .09%.  The PCRA court noted that the testimony suggested that an individual with this blood alcohol level would "typically exhibit diminished judgment, inhibition, coordination, and reaction . . . [and] would typically have diminished impulse control and a heightened need for immediate gratification."  PCRA Court Opinion at 8-9 (summarizing N.T. PCRA Hearing, 11/9/09 at 212-13, and 11/10/09 at 287) (internal quotation marks omitted).  Nevertheless, the PCRA court found that "the Trial Record and the PCRA Record are absolutely devoid of any evidence sufficient to establish Bardo was so overwhelmed or overpowered by alcohol to the point of losing his faculties as required to establish voluntary intoxication."  Id. at 9 (internal quotation marks and citation omitted).  Accordingly, the PCRA court held that Bardo had "utterly failed" to establish ineffective assistance under the Strickland/Pierce test.  PCRA Court Opinion at 9.

The PCRA court's ruling is supported by the record and is free of legal error. This Court has previously made clear that a defense of diminished capacity grounded in voluntary intoxication is a very limited defense, which does not exculpate the defendant from criminal liability, but, if successfully advanced, mitigates first-degree murder to third-degree murder. Commonwealth v. Hutchinson, 25 A.3d 277, 312 (Pa. 2011).  The mere fact of intoxication is not a defense; rather, the defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised by voluntary intoxication that he was unable to formulate the specific intent to kill. Id.  In other words, to prove a voluntary intoxication defense, the defendant must show that he was "overwhelmed to the point of losing his faculties and sensibilities."  Id. (quoting Commonwealth v. Blakeney, 946 A.2d 645, 653 (Pa. 2008)).  Evidence that the defendant lacked the ability to control his actions or acted impulsively is irrelevant to

specific intent to kill, and thus does not constitute support of a voluntary intoxication defense. Id.

As the PCRA court determined, there was no evidence presented at trial or at the PCRA hearing that, at the time of his offenses, Bardo was overwhelmed by intoxication to the point of losing his faculties and sensibilities. Indeed, the evidence was uniformly to the contrary. One of Bardo's own expert witnesses, Dr. Blumberg, testified at the PCRA hearing that, at the time of the offenses, Bardo "did not reach the point where he was so impaired that he couldn't formulate an intent to engage in this activity." N.T. PCRA Hearing, 11/9/09, at 93-94; see also id. at 182 (opining that Bardo's alcohol consumption on the night of the offenses "did disinhibit him and impair[ed] his behavioral controls"). Another of Bardo's experts, Dr. Lage, a pharmacologist and toxicologist, opined that with a blood alcohol level of .10%, which was his estimate of Bardo's blood alcohol level at the time of the offenses, an individual would have impaired judgment and a loss "to some extent" of inhibitions. Id. at 213. Thus, the testimony of Bardo's own experts did not establish that, at the time of the offenses, Bardo was unable to formulate the specific intent to kill because he was overwhelmed to the point of losing his faculties and sensibilities by voluntary ingestion of alcohol. The PCRA court's rejection on the merits of Bardo's claim of counsel ineffectiveness for not pursuing a defense of voluntary intoxication is supported by the record; accordingly, the Court will not disturb it.

Bardo's fourth, fifth and sixth issues all involve claims limited to the penalty phase of his initial trial. Given that the PCRA court's grant of penalty phase relief premised upon counsel ineffectiveness relating to the initial sentencing proceeding is affirmed by operation of law, due to this Court's 3-3 deadlock, we need not, and do not, pass upon these additional sentencing claims.

Finally, in his seventh and last issue, which comprises four sentences, Bardo asserts that the cumulative effect of all the alleged errors constituted a denial of due process, entitling him to a new trial. Bardo's Brief at 90. As we have previously held, no number of claims that have been denied because of lack of merit can collectively warrant relief. Commonwealth v. Spotz, 47 A.3d 63, 129 (Pa. 2012). As Bardo has not established that any of the guilt phase claims in his appeal are meritorious, he is not entitled to relief.

### III.     Conclusion

The grant of penalty phase relief, at issue in the Commonwealth's appeal at No. 651 CAP, is affirmed by operation of law, the Court being evenly divided. The denial of guilt phase relief, at issue in Bardo's appeal at No. 650 CAP, is affirmed for the reasons stated in Part II of this *per curiam* Opinion.

Jurisdiction relinquished.

The grant of penalty phase relief, at issue in the Commonwealth's appeal at No. 651 CAP, is affirmed by operation of law, the Court being evenly divided.

The denial of guilt phase relief, at issue in Michael Bardo's appeal at No. 650 CAP, is affirmed for the reasons stated in Part II of the Per Curiam Opinion, which is joined by Mr. Chief Justice Castille and Messrs. Justice Saylor, Eakin, Baer and Stevens.

The Per Curiam Opinion is an Opinion in Support of Reversal as to Part I, addressing Docket No. 651 CAP, and is joined by Mr. Chief Justice Castille and Messrs. Justice Eakin and Stevens.

Mr. Justice Saylor files a Concurring Opinion and Opinion in Support of Affirmance on Docket No. 651 CAP.

Mr. Justice Baer files a Concurring Opinion and Opinion in Support of Affirmance on Docket No. 651 CAP.

Madame Justice Todd files a Concurring Opinion and Opinion in Support of Affirmance on Docket No. 651 CAP.