**[J-117-2020][M.O. - Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 784 CAP |
| | : | |
| Appellee | : | Appeal from Order entered on July 29, |
| | : | 2019 in the Court of Common Pleas, |
| | : | Franklin County, Criminal Division at |
| v. | : | No. CP-28-CR-0000382-1997. |
| | : | |
| | : | SUBMITTED: December 11, 2020 |
| | : | |
| ALBERT E. REID, | : | |
| | : | |
| Appellant | : | |

*CONCURRING AND DISSENTING OPINION*

**JUSTICE SAYLOR**                                  **FILED: September 22, 2021**

I concur in the result relative to the guilt phase and support the remand. I respectfully dissent, however, as to penalty, since I would award a new sentencing proceeding.

This case bears hallmarks of the many problematic capital cases litigated in Pennsylvania through the 1990s and into the 2000s. *See generally Commonwealth v. King*, 618 Pa. 405, 448-57, 57 A.3d 607, 633-38 (2012) (Saylor, J., concurring specially) (collecting cases in which penalty relief was required on account of oftentimes grossly deficient stewardship by capital counsel). Appellant was represented by a public defender and an appointed attorney who had no experience whatsoever with death-

penalty litigation.[1]  The defense's meager and generic opening statement to the jury at the penalty stage was, in its entirety, as follows:

> Morning.  I've addressed you twice before and will conclude this proceeding with more lengthy final monologue.  At this point all that I can say is at this point once again, please cleanse your minds of any expectations, any predeterminations.  Please listen, think, contemplate, ponder, and then impose upon Mr. Reid the appropriate and just sentence in consideration of the facts of the law [sic].  Thank you.

N.T., Oct. 12, 1998, at 839.

The defense presentation then unfolded terribly.  The bulk of the testimony adduced by Appellant's counsel was intentionally elicited to demonstrate his *bad* character in an array of collateral circumstances.  For example, a witness testified that Appellant had caused a fire that destroyed her kitchen and later lied about his involvement.  *See id.* at 874.  Another depicted Appellant as "just a nasty, vindictive person" who "wouldn't even associate with other Jamaicans" at his workplace.  *Id.* at 878.  Another *defense* witness related that Appellant had said about her: "I'm going to kill that white bitch"; *id.* at 884, and this testimony was corroborated by another witness.  *See id.* at 888; *see also id.* at 876-877, 881, 893 (reflecting testimony that Appellant "would fly off in a minute and get in your face and curse you out"; would throw toys in his toy-factory workplace; and would get angry and "rant and rave").  Not surprisingly, Appellant complained to the trial judge that:

---

[1] *See* N.T., March 21, 2013, at 5 (reflecting the testimony of one of Appellant's lawyers that he had previously handled a single homicide case that didn't proceed to trial, had never previously appeared in a capital case, and had no experience investigating or preparing for a penalty proceeding); *id.* at 131 (reflecting the testimony of Appellant's other attorney that he also had no experience in death-penalty litigation).

[A]ll my attorneys [sic] doing is [to] discredit my credibility. . . .

That's all he bring up here to discredit me. You understand what I'm saying, and clearly seen by the Court what he is doing. He is not trying to defend me at all. . . .

*Id.* at 899. And notably, the prosecutor was essentially in concurrence. *See id.* at 898 (reflecting the prosecutor's remark that, "I can understand why [Appellant] wouldn't want this parade of character witnesses.").

The defense strategy, such as it was, was to supplement the bad-character evidence with testimony from a forensic psychiatrist to explain that Appellant's abhorrent behavior derived from mental illness. *See id.* at 912-913.[2] The prosecutor, however, interjected that he had been unable to determine whether a psychiatrist-patient privilege pertained, and therefore, he requested a colloquy. *See id.* at 910. The trial court agreed and explained to Appellant: "[T]he Court believes that the Constitution provides attorney client privileges and also doctor patient privileges, so I'm -- what I want to do is, I'm not going to allow [counsel] to call the psychiatrist unless you agree to it." *Id.* at 911. Confusingly, the trial court repeatedly referenced *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603 (1993), a decision involving circumstances in which counsel acceded to the defendant's wishes to forego a presentation of mitigating evidence, *see id.* at 367-69, 635 A.2d at 611-12, not a scenario such as the present one

---

[2] Even with this explanation, I question whether it was a creditable strategy in the first instance for a defense attorney to impugn his own client with collateral bad-character evidence of the above nature and degree. Here, the jurors already had found, beyond a reasonable doubt, that Appellant had murdered his wife and daughter with malicious intentionality. Additionally, the Commonwealth had presented a plethora of collateral prior-bad-acts evidence in the guilt phase, including testimony from Appellant's sister-in-law to the effect that he had held a knife to her throat and threatened to kill her. *See* N.T., Oct. 6, 1998, at 243. The notion that more damaging, collateral evidence was necessary to supply a factual basis for the psychiatrist's testimony is misguided.

in which the attorney was attempting to adduce evidence which was critical to the trial strategy he had chosen and to offer context for evidence which, otherwise, was inherently prejudicial to his client.[3]

When Appellant refused to consent to testimony by the psychiatrist, the trial court barred the defense from presenting it. *See* N.T., Oct. 12, 1998, at 918-919. Defense counsel proceeded to deliver the following brief closing remarks, during which, in large part, counsel merely complained about the defense strategy having been thwarted while simultaneously conceding that this could be of no moment in the jurors' decision-making:

> Ladies and gentlemen, this morning when I spoke to you I promised you a rather thorough closing argument. I don't have that argument anymore based on matters that occurred this morning and this afternoon in the courtroom.
>
> You are probably wondering [why the prosecutor] commented on the men and women who have testified about Albert Reid being a nasty person and things of that sort. We were planning on getting information, testimony from experts who did not testify this afternoon at Mr. Reid's election.

---

[3] Although *Sam* contains broader language, the holding of a case is necessarily read in light of the fact presented. *See, e.g.*, *Oliver v. City of Pittsburgh*, 608 Pa. 386, 395, 11 A.3d 960, 966 (2011) (citing *Commonwealth v. McCann*, 503 Pa. 190, 195, 469 A.2d 126, 128 (1983)). Moreover, decisions of the United States Supreme Court confirm that "giving the attorney control of trial management matters is a practical necessity," and developing a defense strategy for trial necessarily includes selecting the witnesses to call. *Gonzalez v. U.S.*, 553 U.S. 242, 249, 128 S. Ct. 249, 1770 (2008) ("Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment *and the larger strategic plan for trial*." (emphasis added)). This is particularly true in the present case, where the controversy arose mid-stream in the defense presentation, after highly damaging evidence in dire need of context already had been adduced.

And I have also been directed by Mr. Reid not to argue certain areas. That was our whole plan today, so I'm left with just telling you what Mr. Reid has allowed me to argue with you is that he has no prior record in the United States and he has shown today that he was adaptive to prison and probably would, I guess, do well in the state prison.

He's shown that through the facts he's done well in the Franklin County Prison for the last two years. That's all that we have as mitigating circumstances, and it's up to you to decide whether that outweighs the aggravating circumstances presented by the Commonwealth[, *i.e.*, killing of a prosecution witness, killing in perpetration of a felony, and multiple murders].

The purpose of presenting those persons this morning was not to show on our part that Mr. Reid was nasty and Mr. Reid was throwing toys. There was a conclusion but unfortunately you can't consider that. I really don't have anything else to say. We hope that after weighing the circumstances, the two mitigating circumstances that we presented, that you would consider life imprisonment for Mr. Reid.

Judge Walker will tell you in his charge life imprisonment in Pennsylvania means that you will serve life in prison. You will not be paroled unless the governor commutes your sentence.

Then there is other circumstances after that. I understand life imprisonment does not mean you get out in ten years just because you may have heard that from other states. Thank you.

*Id.* at 927-928. I agree with Appellant that "[t]his closing was affirmatively harmful and fell below the standard for practice for capital defense counsel." Brief for Appellant at 118.

Furthermore, there is no psychiatrist-patient privilege running from a non-treating psychiatrist to a criminal defendant subject to forensic assessment. *See* N.T., July 29,

2013, at 76-77 (testimony of Neil Blumberg, M.D.); N.T., July 30, 2013, at 20 (testimony of Abram Hostetter, M.D.). In my judgment, trial counsel rendered deficient stewardship in failing to oppose the prosecutor's request for a colloquy based upon a non-existent privilege. With a proper response by the trial court to such an objection, a colloquy should never have ensued, and there would have been no basis to bar the psychiatric testimony which was the linchpin of the defense strategy.[4]

I also conclude that appellate counsel was ineffective for failing to raise the above issue on direct appeal on these terms. As this case preceded *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), appellate counsel also was required, but failed, to conduct an extra-record investigation. *See* N.T., March 22, 2013, at 22 (reflecting the testimony of appellate counsel -- who also had no experience in capital litigation -- explaining that he was of the erroneous belief that he was responsible to raise only record-based claims at the direct-appeal stage). Had he done so, counsel could have adduced the unrebutted evidence presented at post-conviction that Appellant's uncooperativeness and explosiveness derived from mental illness and organic brain damage. *See, e.g.,* N.T., July 29, 2013, at 29-36 (testimony of Stephen A. Ragusea, PsyD); N.T., July 30, 2013, at 20 (testimony of Dr. Hostetter).[5] In the circumstances, I

---

[4] More broadly, I find the approach of permitting the Commonwealth to force mid-trial colloquies with the defendant about matters of trial strategy to be particularly problematic.

[5] Of course, given constraints attending the presentation of direct appeals, the task of conducting a proper extra-record investigation at the direct-appeal stage was a "Herculean" one. *Grant*, 572 Pa. at 66, 813 A.2d at 737. However, I find this to be a reflection of a systemic problem that shouldn't redound to the detriment of appellants in criminal cases and post-conviction petitioners. *See, e.g., Commonwealth v. Ly*, 605 Pa. 261, 263, 989 A.2d 2, 3 (2010) (Saylor, J., dissenting) ("The Court has never explained . . . how requiring Herculean endeavors of counsel [in pre-*Grant*] cases reconciles with the requirement of fairness."). Accordingly, the only rational way of applying the Court's pre-*Grant* requirements, as they were portrayed in the majority opinion in *Grant*, is to (continued…)

am uncomfortable with the approach of faulting Appellant himself for the very poor quality of the defense presentation at the penalty stage of trial. *See, e.g.*, *Commonwealth v. Reid*, No. 382-1997, *slip op.* at 6, 10 (C.P. Franklin July 29, 2019).

Finally, I respectfully differ with the majority's position that litigants are precluded from presenting inconsistent arguments on appeal, in the alternative. *See* Majority Opinion, *slip op.* at 62. In this regard, I find such presentation to be materially distinct from the proffer of irreconcilably inconsistent evidence at trial, as discussed in the *Interest of J.B.* decision referenced by the majority. In any event, I do not view Appellant's arguments as being materially inconsistent. Rather, in my judgment, they are better considered to reflect the uniquely untenable circumstances underlying Appellant's salient claim.

In rejoinder, the majority depicts my analysis as reflecting merely "general concerns" regarding Appellant's counsels' qualifications and the overall quality of their representation" that are "substantially untethered to the specific claims raised by Appellant." Majority Opinion, *slip op.* at 68 n.22. I have great difficulty with this characterization, as the main purport of my assessment rests on a specific failure on the part of defense counsel to object to an inappropriate colloquy that deprived the defense of the opportunity to present essential mental-health mitigation evidence.[6] This failure is specifically highlighted by Appellant in the summary of his argument, as follows:

---

(…continued)
assume that appellate counsel was capable of doing what post-conviction counsel has done, *i.e.*, conducting a reasonable and adequate extra-record investigation.

[6] To the extent that the majority suggests that the lack of training and experience in death-penalty litigation is irrelevant to the performance of capital counsel, I respectfully disagree. As I have said many times particularly by way of responsive opinions, the systemic issues in need of redress provide a ready explanation for the poor
(continued…)

> Counsel . . . failed to present the evidence of Appellant's mental illness that they had in hand because: the trial court precluded the presentation of mental health evidence based on its mistaken belief that this testimony was covered by the doctor-patient privilege; and trial counsel failed to object to the trial court's erroneous determination. The trial court's ruling also deprived Appellant of his right to present mitigation evidence -- a right that he did not validly waive. Appellate counsel was ineffective for failing to litigate any of these issues.

Brief for Appellant at 14. In the body of his brief, Appellant develops his position in detail, employing the three-part ineffectiveness standard in the body of his brief. *See* Brief for Appellant at 106-122 (arguing, *inter alia*, that "[r]easonable counsel would have objected to: the trial court's finding of doctor-patient privilege; the restriction on their ability to present mitigation evidence as an improper infringement of an attorney's area of expertise and authority and Appellant's right to present mitigation; . . .").

In terms of prejudice, Appellant does precisely what this Court requires:

> When assessing prejudice in the context of a claim of trial counsel ineffectiveness for failing to present additional evidence of mitigation in a death penalty case, the PCRA court must directly compare the mitigation case offered at trial with the credited mitigation evidence offered on post-conviction review. The goal of this comparison is to determine whether it is (or is not) reasonably probable that, had the additional evidence of mitigation been presented at trial, at least one juror would have concluded that the mitigating circumstances outweighed or were as weighty as the aggravating circumstances, and thus would have voted for a sentence of life imprisonment rather than death.

---

(…continued)
performance we have seen in a plethora of cases. *See, e.g.*, *Commonwealth v. Kohler*, 614 Pa. 159, 162, 36 A.3d 121, 162 (2012) (Saylor, J., concurring).

*Commonwealth v. Bardo*, 629 Pa. 352, 363, 105 A.3d 678, 684–85 (2014) (citation omitted). Here, Appellant extensively discusses "the presentation that reasonable counsel would have made," explaining that "the jury would have learned that Appellant suffered from brain damage, was mentally ill, and his irrational behavior was a product of these impairments." Brief for Appellant at 113-114.

Respectfully, while I may not have previously bookmarked each element of an ineffectiveness claim in my analysis, I believe they are sufficiently covered in substance. And certainly these are both covered *and bookmarked* in Appellant's brief, as are the observations about counsel's lack of experience and the very poor quality of defense counsel's presentation and remarks to the jurors during the penalty phase of trial. *See, e.g.*, *id.* at 40, 99-100, 117-118.

The majority also faults my opinion for failing to account for Appellant's recalcitrance in providing assistance to his attorneys. *See* Majority Opinion, *slip op.* at 68 n.22. But I have said that the unrebutted post-conviction evidence presented by Appellant indicates that the non-cooperation resulted from organic brain damage and mental illness, which is also precisely Appellant's argument.[7] Moreover, the disparate experience, training and resources as between appointed defense counsel and the federally-funded post-conviction bar has clearly revealed pervasive, systemic problems in Pennsylvania. The fact of the matter, however, is that PCRA counsel was able to

---

[7] Indeed, it seems incongruous that the majority would remand for a specific determination about defense counsel's stewardship relative to whether Appellant was ever competent to be tried in the first place, while simultaneously assuming that the record adequately evidences his ability to assist his counsel. This approach is particularly problematic, where the PCRA court has refrained from squarely confronting the unrefuted post-conviction evidence that mental illness and brain damage impacted both Appellant's competency and cooperation.

secure Appellant's cooperation sufficient to develop life-history, mental-health, and organicity evidence, none of which was presented at trial.

I recognize the strength of the aggravating circumstances demonstrated by the Commonwealth, including the powerful multiple-murders aggravator. Nevertheless, in a regime where a capital sentence may be avoided by persuading only one juror that in his or her moral calculus it is not appropriate to put the defendant to death, I do not support removing the determination from a jury, where materially deficient stewardship has deprived the jurors of strong mitigation evidence, here in particular, unrebutted evidence of brain damage. *Cf. Commonwealth v. Cox*, 603 Pa. 223, 290, 983 A.2d 666, 707 (2009) (Saylor, J., concurring) ("I also depart from the majority position to the degree it is asserting that testimony from a mental-health expert concerning the effects of poverty, neglect, and abuse during a capital defendant's upbringing could not sway a rational jury to return a life sentence in a case involving multiple murders.").

Justice Donohue joins this concurring and dissenting opinion.